UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

M. DIANE KOKEN, acting in her official )
capacity as Insurance Commissioner of the )
Commonwealth of Pennsylvania as )
Statutory Liquidator of Legion Insurance )
Company and Villanova Insurance Company, )
)
         Plaintiff, )
)
v. ) No. 05 C 1049
)
AMERICAN PATRIOT INSURANCE AGENCY, ) Judge Nan R. Nolan
INC., a Wisconsin corporation, and LYSA )
JO SARAN, an individual, )
)
         Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff M. Diane Koken, Insurance Commissioner of the Commonwealth of Pennsylvania ("Liquidator"), is the Statutory Liquidator for two insolvent Pennsylvania insurance companies: Legion Insurance Company ("Legion") and Villanova Insurance Company ("Villanova"). In this lawsuit, the Liquidator seeks to recover more than $4 million in premiums and commissions allegedly due to the insurance companies pursuant to a Limited Agency Agreement between Legion and Defendant American Patriot Insurance Agency, Inc. ("Patriot"). The Liquidator alleges that Defendant Lysa Jo Saran is also liable in her capacity as President of Patriot. Defendants deny that they owe any money to the Liquidator and have asserted several affirmative defenses to liability, including that Legion and its related companies perpetrated a fraud upon Patriot and its owner/shareholders, Diane and Kenneth Hendricks.

Defendants have filed a motion to compel seeking (1) a complete copy of Reinsurance Treaty 103; and (2) a copy of a Consulting Agreement between the Liquidator and Andrew Walsh, Legion's former general counsel. For the reasons set forth here, the motion is granted.

## BACKGROUND

Patriot is an insurance producer that marketed and sold Legion policies pursuant to a March 23, 1997 Limited Agency Agreement. (Cmplt. ¶¶ 11, 12.) On July 25, 2003, the Commonwealth Court of Pennsylvania issued an order placing Legion in liquidation and appointing M. Diane Koken as the Liquidator. (Ex. C to Cmplt.) On February 22, 2005, the Liquidator filed suit against Patriot alleging breach of contract, breach of fiduciary duty, and negligence, and demanding an accounting of premiums and commissions due under the Agreement. Defendants have asserted 11 affirmative defenses to liability, including fraud.

### A. The Rent-a-Captive Insurance Program

The alleged fraud relates to a so-called "Rent-a-Captive" workers' compensation insurance program marketed to Patriot by Mutual Risk Management, Ltd. ("Mutual Risk"), Commonwealth Risk Services, L.P. ("Commonwealth Risk"), Legion, Villanova, and Mutual Indemnity (Bermuda), Ltd. ("MIB") (collectively, the "Mutual Entities"). In or about March of 1997, Patriot decided to establish a Rent-a-Captive program called the "Roofers' Advantage Program" (the "Program"). In connection with that Program, Patriot executed the following documents: (1) a proposal provided by Commonwealth Risk; (2) an agency agreement between Legion and Patriot (the Limited Agency Agreement); and (3) a Shareholder Agreement between Patriot and Mutual Holdings (Bermuda), Ltd. ("Mutual Holdings").

Under the Program, Legion acted as an insurance company issuing workers' compensation policies to roofing contractors on Patriot's behalf. Legion transmitted a Proposal to Patriot for each Program year setting forth projected premium payments minus projected financial expenses, resulting in a "Total Loss Fund." Legion retained 10% of the premiums at the beginning of each Program year to pay losses and expenses for that year. Legion then ceded the remainder of the Total Loss Fund (the "Ceded Loss Fund") to its reinsurer (MIB) under Reinsurance Treaty 103. As

2

the insurer, Legion had primary responsibility for all insured losses up to the applicable policy limits. Once the losses and expenses in a Program year exceeded Legion's 10% retention, however, MIB would reimburse Legion for additional losses up to an agreed-upon cap, which MIB would pay out of the Ceded Loss Fund. If losses exceeded the Ceded Loss Fund, Patriot assumed responsibility for payment up to a certain amount, referred to as the Aggregate Attachment Point.

The parties disagree as to the liability distribution after this point. Defendants claim that all amounts exceeding the Aggregate Attachment Point became the responsibility of Legion. The Liquidator insists that pursuant to a 1993 Amendment to the Reinsurance Treaty, MIB provided an additional "fourth layer" of reinsurance coverage. This dispute is relevant to Defendants' fraud affirmative defense as described below.

### B. The Alleged Fraud

Citing an April 7, 2002 affidavit from Eric Bossard, Legion's former Vice President, and a December 1, 2005 affidavit from James Agnew, former Vice President of Commonwealth Risk, Defendants claim that in February 2000, Bossard and Agnew met with Lysa Saran and Diane Hendricks at Patriot's offices in Oak Brook, Illinois to discuss the Program. According to Bossard and Agnew, Mrs. Hendricks expressed concern about growing losses under the Program, and about her belief that Patriot's potential liability extended beyond the Aggregate Attachment Point. Agnew told Mrs. Hendricks that he would look into her concerns. (Bossard Aff. ¶¶ 20, 21; Agnew Aff. ¶¶ 5-7.)

Within a week, Bossard and Agnew returned to Legion's offices, where they took part in several discussions relating to Patriot. Bossard and Agnew first met with Glenn Partridge, Legion's Executive Vice President, and Richard Turner, President of Commonwealth Risk, in Partridge's office. During the meeting, Bossard expressly conveyed Mrs. Hendricks's belief that Patriot was responsible for all amounts above the Aggregate Attachment Point. The four men then called

3

Andrew Walsh, Legion's general counsel, who purportedly confirmed that, in fact, Legion was responsible for all losses in excess of the Aggregate Attachment Point. He indicated, further, that the Program documents could not be amended retroactively to place the legal obligation on Patriot. (*Id.* ¶¶ 22, 23; Agnew Aff. ¶¶ 8-10.)

At this point, Walsh joined Bossard, Agnew, Partridge, and Turner in Partridge's office. The gentlemen called David Alexander, President of MIB, and relayed Mrs. Hendricks's concerns to him. Partridge then asked if the attendees thought they could induce Patriot to pay additional amounts to cap these perceived, though non-existent, losses. The gentlemen decided that they would request $1 million. At the end of the meeting, Walsh, Partridge, Turner, and Alexander instructed Bossard to inform Mrs. Hendricks that Patriot was liable beyond the Aggregate Attachment Point, but that she could remedy the situation by purchasing reinsurance at a cost of $1 million. Patriot agreed to the proposal, but Legion never purchased the reinsurance. (*Id.* ¶¶ 24, 25; Agnew Aff. ¶¶ 11-14.)

For its part, Legion denies any wrongdoing, insisting that pursuant to the 1993 Amendment to the Reinsurance Treaty, Patriot was in fact liable for losses above the Aggregate Attachment Point. Legion claims that the $1 million was for MIB's agreement not to seek reimbursement from the Hendrickses at the fourth layer of reinsurance and that, because MIB never purchased additional insurance, it is now carrying $1 million as a payable credit to the Hendrickses.

### C. The Walsh Deposition

During the deposition of Andrew Walsh, Patriot's counsel asked Walsh to review Bossard's April 7, 2002 affidavit setting forth the alleged fraud, and to comment on the discussions described therein. Counsel for the Liquidator objected on the basis of attorney-client privilege. Counsel for the Liquidator raised similar objections at the deposition of Richard Turner, and indicated that they would take the same position at the deposition of Glenn Partridge. Defendants filed a motion to

4

overrule the claim of privilege pursuant to the crime-fraud exception, which this court denied without prejudice on May 9, 2006. (Minute Order of 5/9/06, Doc. 77.) Defendants have appealed that ruling to the district court.

Walsh also testified at his deposition that when he left Legion in November 2003, he entered into a Consulting Agreement with the Liquidator. Walsh described this as a "one year consulting contract, that required [him] to provide services relating to certain ongoing arbitrations that might come up as well as be available for consulting on issues that might come up." (Walsh Dep., at 33.) Walsh was compensated for his consulting services on an hourly basis plus expenses. (*Id.* at 37.) Walsh testified that in connection with the Agreement, he was given continued access to certain emails and documents as decided by Legion's President Joseph Boyle. (*Id.* at 33-34.) Walsh was unable to recall, however, whether he retained any documents relating to the American Patriot Program; whether the Liquidator or Legion signed the Consulting Agreement; the date the Agreement was signed; or whether the parties discussed the issue of indemnification during the negotiation process, which lasted "a couple of days." (*Id.* at 35-38.)

### D. The Motion to Compel

In light of the Liquidator's reliance on Reinsurance Treaty 103 in defense of Defendants' motion to overrule the attorney-client privilege, Defendants now move to compel the Liquidator to produce a complete copy of that Treaty. Defendants also seek a copy of the Consulting Agreement Walsh entered into with the Liquidator.

### DISCUSSION

Federal Rule of Civil Procedure 26(b)(1) prescribes the scope of matters upon which a party may seek discovery. "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

5

FED. R. CIV. P. 26(b)(1). "Requests for discovery are relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 235 F.R.D. 447 (N.D. Ill. 2006) (citing *Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108, 1111 (N.D. Ill. 2004)). The burden rests upon the objecting party to show why a particular discovery request is improper. *Id.*

## A. Reinsurance Treaty 103

The Liquidator has produced a copy of Reinsurance Treaty 103 together with "a complete set of those exhibits referenced in Article 3 that refer to the American Patriot programs." (Pl. Resp., at 3.) Defendants argue that the Liquidator should also be required to produce exhibits to that Treaty which relate to other insurance programs. Defendants note that Walsh testified at his deposition that in order to understand whether the aggregate limits of the Reinsurance Treaty have been impaired and, thus, determine each participant's excess exposure, "[y]ou would need to know the loss experience of other programs." (Walsh Dep., at 89.) The Liquidator insists that Defendants are confusing "exposure to actual losses after they occur with exposure to potential losses before they occur." (Pl. Resp., at 4.) In the Liquidator's view, "[w]hether or not losses actually occurred at some future point is not relevant to whether or not there was risk at the time the insurance was purchased." (*Id.* at 5.)

As noted, the Liquidator has relied on Reinsurance Treaty 103 in opposing Defendants' fraud affirmative defense and motion to overrule attorney-client privilege. The Liquidator has thus placed the Reinsurance Treaty and its proper interpretation at issue in this case. The Liquidator may ultimately establish that Patriot's potential risk did not depend upon the loss experience of other programs, but Defendants are not required to take the Liquidator's word for this proposition. "Requests for discovery are relevant if there is any possibility that the information sought may be relevant to the subject matter of the action," and "[t]he scope of discovery should be broad in order

6

to aid in the search for truth." Kodish, 235 F.R.D. 447. The Liquidator has not met her burden of establishing that the complete Reinsurance Treaty is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.

The Liquidator nonetheless objects that producing the additional exhibits will be unduly burdensome. She estimates that there are approximately 2,000 exhibits relating to other insurance programs, and notes that the documents "may contain confidential, privileged or proprietary information." (Pl. Resp., at 5.) Under FED. R. CIV. P. 26(c), a court may, for good cause shown, limit discovery that is unduly burdensome. Patterson v. Avery Dennison Corp., 281 F.3d 676, 681-82 (7th Cir. 2002). "In deciding whether good cause exists, the court must balance the interests of the parties, taking into account the likelihood of the request leading to the discovery of relevant materials and the burden of production." Ferus ex rel. Estate of Ricciardi v. U.S., No. 05 C 50009, 2006 WL 1460011, at *1 (N.D. Ill. May 24, 2006). The Liquidator has not demonstrated that the burden of producing the exhibits outweighs the likely benefit to Patriot and, thus, Defendants' motion to compel is granted.

To the extent the exhibits may contain confidential information, the parties may properly agree amongst themselves to limit disclosure of unfiled discovery information to certain specified persons during the litigation and not to voluntarily disseminate such information to other persons. Such a confidentiality agreement amongst the parties regarding the categories of the information they seek to protect from dissemination to persons not involved in the lawsuit does not require court approval or intervention.[1] See Taffinger v. Bethlehem Steel Corp., No. Civ. A. 00-4668, 2001 WL 1287625, at *3 (E.D. Pa. Oct. 24, 2001).

---

[1] The court reminds the parties that in the event they do seek a protective order, they must comply with Judge Holderman's standing order.

## B. Consulting Agreement

Defendants also seek a copy of the Consulting Agreement Walsh entered into with the Liquidator when he left Legion in November 2003. The Liquidator has refused, arguing that to the extent Defendants were able to depose Walsh regarding the terms of the Agreement, it would be cumulative to require her to produce the actual Agreement. (Pl. Resp., at 1.) The court disagrees. Defendants first learned about the existence of the Agreement at Walsh's deposition, and he was unable to recall many of its details. Thus, Defendants have not received a full and fair opportunity to explore the document. The Liquidator does not dispute that "evidence regarding compensation [from a party] is relevant to a witness's bias and credibility." *Portis v. City of Chicago*, No. 02 C 3139, U.S. Dist. LEXIS 18241, at *12 (N.D. Ill. Aug. 24, 2005) (Nolan, J.) Significantly, the Liquidator had sued Walsh in the Commonwealth Court of Pennsylvania, but dropped that suit prior to entering into the Agreement. (Ex. 7 to Def. Mem.) The Liquidator has relied on Walsh's interpretation of the Reinsurance Treaty to defeat Defendants' fraud affirmative defense and Defendants are entitled to explore his potential bias. The Liquidator is thus ordered to produce the Consulting Agreement.

Once again, to the extent the exhibits may contain confidential information, the parties may properly agree amongst themselves to limit disclosure of unfiled discovery information to certain specified persons without the need for court approval or intervention. *See Taffinger*, 2001 WL 1287625, at *3.

## CONCLUSION

For the reasons stated above, Defendants' first motion to compel [Doc. 94] is granted.

ENTER:

Dated: June 20, 2006

*Nan R. Nolan*
NAN R. NOLAN
United States Magistrate Judge

8