IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| M. DIANE KOKEN, Insurance Commissioner of the Commonwealth of Pennsylvania, acting in her official capacity as Statutory Liquidator of Legion Insurance Company and Villanova Insurance Company, | ) ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 1049 |
| | ) | |
| AMERICAN PATRIOT INSURANCE AGENCY, INC., a Wisconsin corporation, and LYSA JO SARAN, an individual, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On June 8, 2006, the court granted American Patriot Insurance Agency, Inc. ("American Patriot") and Lysa Jo Saran ("Saran") (collectively "Defendants") leave to file a Memorandum in Support of (1) Their Objections to the Magistrate's Order Dated May 9, 2006 and (2) Motion to Amend Case Management Scheduling Order. (Dkt. No. 83-2). For reasons stated below, the court denies Defendants' Objections to the Magistrate's Order Dated May 9, 2006 and finds the Motion to Amend moot at this point in the proceedings. Additionally, because the question of privilege has effectively been stayed, Defendants' Motion to Supplement the Record in Support of Defendants' Objections, (Dkt. No. 166), is also denied as moot.

PROCEDURAL HISTORY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

M. DIANE KOKEN, Insurance Commissioner of the )
Commonwealth of Pennsylvania, acting in her )
official capacity as Statutory Liquidator of )
Legion Insurance Company and Villanova Insurance )
Company, )
)
          Plaintiff, )
)
    v. )      No. 05 C 1049
)
AMERICAN PATRIOT INSURANCE )
AGENCY, INC., a Wisconsin corporation, )
and LYSA JO SARAN, an individual, )
)
          Defendants. )

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

      On June 8, 2006, the court granted American Patriot Insurance Agency, Inc. ("American

Patriot") and Lysa Jo Saran ("Saran") (collectively "Defendants") leave to file a Memorandum

in Support of (1) Their Objections to the Magistrate's Order Dated May 9, 2006 and (2) Motion

to Amend Case Management Scheduling Order. (Dkt. No. 83-2). For reasons stated below, the

court denies Defendants' Objections to the Magistrate's Order Dated May 9, 2006 and finds the

Motion to Amend moot at this point in the proceedings. Additionally, because the question of

privilege has effectively been stayed, Defendants' Motion to Supplement the Record in Support

of Defendants' Objections, (Dkt. No. 166), is also denied as moot.

## PROCEDURAL HISTORY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| M. DIANE KOKEN, Insurance Commissioner of the Commonwealth of Pennsylvania, acting in her official capacity as Statutory Liquidator of Legion Insurance Company and Villanova Insurance Company, | ) ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 1049 |
| | ) | |
| AMERICAN PATRIOT INSURANCE AGENCY, INC., a Wisconsin corporation, and LYSA JO SARAN, an individual, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On June 8, 2006, the court granted American Patriot Insurance Agency, Inc. ("American Patriot") and Lysa Jo Saran ("Saran") (collectively "Defendants") leave to file a Memorandum in Support of (1) Their Objections to the Magistrate's Order Dated May 9, 2006 and (2) Motion to Amend Case Management Scheduling Order. (Dkt. No. 83-2). For reasons stated below, the court denies Defendants' Objections to the Magistrate's Order Dated May 9, 2006 and finds the Motion to Amend moot at this point in the proceedings. Additionally, because the question of privilege has effectively been stayed, Defendants' Motion to Supplement the Record in Support of Defendants' Objections, (Dkt. No. 166), is also denied as moot.

PROCEDURAL HISTORY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

M. DIANE KOKEN, Insurance Commissioner of the )
Commonwealth of Pennsylvania, acting in her )
official capacity as Statutory Liquidator of )
Legion Insurance Company and Villanova Insurance )
Company, )
)
        Plaintiff, )
)
    v. )      No. 05 C 1049
)
AMERICAN PATRIOT INSURANCE )
AGENCY, INC., a Wisconsin corporation, )
and LYSA JO SARAN, an individual, )
)
        Defendants. )

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On June 8, 2006, the court granted American Patriot Insurance Agency, Inc. ("American

Patriot") and Lysa Jo Saran ("Saran") (collectively "Defendants") leave to file a Memorandum

in Support of (1) Their Objections to the Magistrate's Order Dated May 9, 2006 and (2) Motion

to Amend Case Management Scheduling Order. (Dkt. No. 83-2). For reasons stated below, the

court denies Defendants' Objections to the Magistrate's Order Dated May 9, 2006 and finds the

Motion to Amend moot at this point in the proceedings. Additionally, because the question of

privilege has effectively been stayed, Defendants' Motion to Supplement the Record in Support

of Defendants' Objections, (Dkt. No. 166), is also denied as moot.

PROCEDURAL HISTORY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| M. DIANE KOKEN, Insurance Commissioner of the Commonwealth of Pennsylvania, acting in her official capacity as Statutory Liquidator of Legion Insurance Company and Villanova Insurance Company, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) No. 05 C 1049 |
| AMERICAN PATRIOT INSURANCE AGENCY, INC., a Wisconsin corporation, and LYSA JO SARAN, an individual, | ) ) ) ) |
| Defendants. | ) ) |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On June 8, 2006, the court granted American Patriot Insurance Agency, Inc. ("American Patriot") and Lysa Jo Saran ("Saran") (collectively "Defendants") leave to file a Memorandum in Support of (1) Their Objections to the Magistrate's Order Dated May 9, 2006 and (2) Motion to Amend Case Management Scheduling Order. (Dkt. No. 83-2). For reasons stated below, the court denies Defendants' Objections to the Magistrate's Order Dated May 9, 2006 and finds the Motion to Amend moot at this point in the proceedings. Additionally, because the question of privilege has effectively been stayed, Defendants' Motion to Supplement the Record in Support of Defendants' Objections, (Dkt. No. 166), is also denied as moot.

PROCEDURAL HISTORY

M. Diane Koken ("the Liquidator"), Insurance Commissioner of the Commonwealth of Pennsylvania, is the statutory liquidator of two insolvent Pennsylvania insurance companies, Legion Insurance Company ("Legion") and Villanova Insurance Company ("Villanova"). On February 22, 2005, the Liquidator brought this case against American Patriot and its President, Saran, to recover approximately $4 million in premiums, credits, and commissions allegedly owed to Legion/Villanova under a Limited Agency Agreement between American Patriot and Legion. (Compl. ¶¶ 1, 3). American Patriot and Saran have denied the alleged contractual obligations and have asserted various affirmative defenses to liability, including that Legion and its related companies perpetrated a fraud upon American Patriot and its owners/shareholders, Diane and Kenneth Hendricks. (American Patriot's Answer, Dkt. No. 10 at 14-21; Saran's Answer, Dkt. No. 54, at 12-20).

By Order of the Executive Committee of the Court, this case was referred to Magistrate Judge Jan R. Nolan for purposes of discovery supervision. (Dkt. No. 56). On June 8, 2006, the court granted Defendants leave to file a Memorandum in Support of (1) Their Objections to the Magistrate's Order Dated May 9, 2006 and (2) Motion to Amend Case Management Scheduling Order. ("Defs.' Mem." Dkt. No. 83-2). During the course of briefing their Objections, Defendants also filed a Motion to Supplement the Record in Support of Defendants' Objections, requesting permission to supplement the record with the October 26, 2006 affidavit of H. James Agnew. ("Motion to Supplement" Dkt. No. 166). The court took Defendants' Motion to Supplement under advisement, noting the Liquidator's opposition to the motion in open court. (*See* Order of Nov. 2, 2006, Dkt. No. 169). Defendants also made an oral motion to supplement the record with deposition testimony of Eric Bossard, taken in relation to an arbitration hearing

M. Diane Koken ("the Liquidator"), Insurance Commissioner of the Commonwealth of Pennsylvania, is the statutory liquidator of two insolvent Pennsylvania insurance companies, Legion Insurance Company ("Legion") and Villanova Insurance Company ("Villanova"). On February 22, 2005, the Liquidator brought this case against American Patriot and its President, Saran, to recover approximately $4 million in premiums, credits, and commissions allegedly owed to Legion/Villanova under a Limited Agency Agreement between American Patriot and Legion. (Compl. ¶¶ 1, 3). American Patriot and Saran have denied the alleged contractual obligations and have asserted various affirmative defenses to liability, including that Legion and its related companies perpetrated a fraud upon American Patriot and its owners/shareholders, Diane and Kenneth Hendricks. (American Patriot's Answer, Dkt. No. 10 at 14-21; Saran's Answer, Dkt. No. 54, at 12-20).

By Order of the Executive Committee of the Court, this case was referred to Magistrate Judge Jan R. Nolan for purposes of discovery supervision. (Dkt. No. 56). On June 8, 2006, the court granted Defendants leave to file a Memorandum in Support of (1) Their Objections to the Magistrate's Order Dated May 9, 2006 and (2) Motion to Amend Case Management Scheduling Order. ("Defs.' Mem." Dkt. No. 83-2). During the course of briefing their Objections, Defendants also filed a Motion to Supplement the Record in Support of Defendants' Objections, requesting permission to supplement the record with the October 26, 2006 affidavit of H. James Agnew. ("Motion to Supplement" Dkt. No. 166). The court took Defendants' Motion to Supplement under advisement, noting the Liquidator's opposition to the motion in open court. (*See* Order of Nov. 2, 2006, Dkt. No. 169). Defendants also made an oral motion to supplement the record with deposition testimony of Eric Bossard, taken in relation to an arbitration hearing

M. Diane Koken ("the Liquidator"), Insurance Commissioner of the Commonwealth of Pennsylvania, is the statutory liquidator of two insolvent Pennsylvania insurance companies, Legion Insurance Company ("Legion") and Villanova Insurance Company ("Villanova"). On February 22, 2005, the Liquidator brought this case against American Patriot and its President, Saran, to recover approximately $4 million in premiums, credits, and commissions allegedly owed to Legion/Villanova under a Limited Agency Agreement between American Patriot and Legion. (Compl. ¶¶ 1, 3). American Patriot and Saran have denied the alleged contractual obligations and have asserted various affirmative defenses to liability, including that Legion and its related companies perpetrated a fraud upon American Patriot and its owners/shareholders, Diane and Kenneth Hendricks. (American Patriot's Answer, Dkt. No. 10 at 14-21; Saran's Answer, Dkt. No. 54, at 12-20).

By Order of the Executive Committee of the Court, this case was referred to Magistrate Judge Jan R. Nolan for purposes of discovery supervision. (Dkt. No. 56). On June 8, 2006, the court granted Defendants leave to file a Memorandum in Support of (1) Their Objections to the Magistrate's Order Dated May 9, 2006 and (2) Motion to Amend Case Management Scheduling Order. ("Defs.' Mem." Dkt. No. 83-2). During the course of briefing their Objections, Defendants also filed a Motion to Supplement the Record in Support of Defendants' Objections, requesting permission to supplement the record with the October 26, 2006 affidavit of H. James Agnew. ("Motion to Supplement" Dkt. No. 166). The court took Defendants' Motion to Supplement under advisement, noting the Liquidator's opposition to the motion in open court. (*See* Order of Nov. 2, 2006, Dkt. No. 169). Defendants also made an oral motion to supplement the record with deposition testimony of Eric Bossard, taken in relation to an arbitration hearing

M. Diane Koken ("the Liquidator"), Insurance Commissioner of the Commonwealth of Pennsylvania, is the statutory liquidator of two insolvent Pennsylvania insurance companies, Legion Insurance Company ("Legion") and Villanova Insurance Company ("Villanova"). On February 22, 2005, the Liquidator brought this case against American Patriot and its President, Saran, to recover approximately $4 million in premiums, credits, and commissions allegedly owed to Legion/Villanova under a Limited Agency Agreement between American Patriot and Legion. (Compl. ¶¶ 1, 3). American Patriot and Saran have denied the alleged contractual obligations and have asserted various affirmative defenses to liability, including that Legion and its related companies perpetrated a fraud upon American Patriot and its owners/shareholders, Diane and Kenneth Hendricks. (American Patriot's Answer, Dkt. No. 10 at 14-21; Saran's Answer, Dkt. No. 54, at 12-20).

By Order of the Executive Committee of the Court, this case was referred to Magistrate Judge Jan R. Nolan for purposes of discovery supervision. (Dkt. No. 56). On June 8, 2006, the court granted Defendants leave to file a Memorandum in Support of (1) Their Objections to the Magistrate's Order Dated May 9, 2006 and (2) Motion to Amend Case Management Scheduling Order. ("Defs.' Mem." Dkt. No. 83-2). During the course of briefing their Objections, Defendants also filed a Motion to Supplement the Record in Support of Defendants' Objections, requesting permission to supplement the record with the October 26, 2006 affidavit of H. James Agnew. ("Motion to Supplement" Dkt. No. 166). The court took Defendants' Motion to Supplement under advisement, noting the Liquidator's opposition to the motion in open court. (*See* Order of Nov. 2, 2006, Dkt. No. 169). Defendants also made an oral motion to supplement the record with deposition testimony of Eric Bossard, taken in relation to an arbitration hearing

M. Diane Koken ("the Liquidator"), Insurance Commissioner of the Commonwealth of Pennsylvania, is the statutory liquidator of two insolvent Pennsylvania insurance companies, Legion Insurance Company ("Legion") and Villanova Insurance Company ("Villanova"). On February 22, 2005, the Liquidator brought this case against American Patriot and its President, Saran, to recover approximately $4 million in premiums, credits, and commissions allegedly owed to Legion/Villanova under a Limited Agency Agreement between American Patriot and Legion. (Compl. ¶¶ 1, 3). American Patriot and Saran have denied the alleged contractual obligations and have asserted various affirmative defenses to liability, including that Legion and its related companies perpetrated a fraud upon American Patriot and its owners/shareholders, Diane and Kenneth Hendricks. (American Patriot's Answer, Dkt. No. 10 at 14-21; Saran's Answer, Dkt. No. 54, at 12-20).

By Order of the Executive Committee of the Court, this case was referred to Magistrate Judge Jan R. Nolan for purposes of discovery supervision. (Dkt. No. 56). On June 8, 2006, the court granted Defendants leave to file a Memorandum in Support of (1) Their Objections to the Magistrate's Order Dated May 9, 2006 and (2) Motion to Amend Case Management Scheduling Order. ("Defs.' Mem." Dkt. No. 83-2). During the course of briefing their Objections, Defendants also filed a Motion to Supplement the Record in Support of Defendants' Objections, requesting permission to supplement the record with the October 26, 2006 affidavit of H. James Agnew. ("Motion to Supplement" Dkt. No. 166). The court took Defendants' Motion to Supplement under advisement, noting the Liquidator's opposition to the motion in open court. (*See* Order of Nov. 2, 2006, Dkt. No. 169). Defendants also made an oral motion to supplement the record with deposition testimony of Eric Bossard, taken in relation to an arbitration hearing

in 2003.  With no objections from the Liquidator on this point, the court granted Defendants' oral motion, and Defendants filed the deposition testimony with the court.  In response, the Liquidator filed a Motion for Protective Orders Regarding the Transcript of Eric Bossard and Confidentiality Agreement and Order from Reinsurance Arbitration, ("Motion for Protective Orders" Dkt. No. 171), which has been fully briefed and is the subject of a separate order by this court.  Finally, in July of 2006, the court granted non-party witnesses Andrew Walsh, Richard Turner, and Glenn Partridge leave to file and brief a position paper with the court regarding Defendants' Objections.

FACTUAL BACKGROUND

In March of 1997, American Patriot established a "rent-a-captive" insurance program called the Roofers Advantage Program ("the Program").  This program was marketed to American Patriot by Mutual Risk Management, Ltd. ("Mutual Risk"), Commonwealth Risk Services, L.P. ("Commonwealth Risk"), Legion, Villanova, and Mutual Indemnity (Bermuda), Ltd. ("MIB") (collectively, the "Mutual Entities").  In order to set-up the Program, American Patriot executed the following documents:  (1) a Proposal provided by Commonwealth Risk; (2) a Limited Agency Agreement between Legion and American Patriot; and (3) a Shareholders Agreement between American Patriot and Mutual Holdings (Bermuda), Ltd. ("Mutual Holdings"), the parent company of MIB.

Under the Program, Legion acted as an insurance company, issuing workers' compensation policies to roofing contractors on behalf of American Patriot.  As the insurer, Legion had primary responsibility for all insured losses up to the applicable policy limits.  Each year, Legion retained an Annual Aggregate Retention (10% of the gross written premium) to

in 2003.  With no objections from the Liquidator on this point, the court granted Defendants'

oral motion, and Defendants filed the deposition testimony with the court.  In response, the

Liquidator filed a Motion for Protective Orders Regarding the Transcript of Eric Bossard and

Confidentiality Agreement and Order from Reinsurance Arbitration, ("Motion for Protective

Orders" Dkt. No. 171), which has been fully briefed and is the subject of a separate order by this

court.  Finally, in July of 2006, the court granted non-party witnesses Andrew Walsh, Richard

Turner, and Glenn Partridge leave to file and brief a position paper with the court regarding

Defendants' Objections.

FACTUAL BACKGROUND

In March of 1997, American Patriot established a "rent-a-captive" insurance program

called the Roofers Advantage Program ("the Program").  This program was marketed to

American Patriot by Mutual Risk Management, Ltd. ("Mutual Risk"), Commonwealth Risk

Services, L.P. ("Commonwealth Risk"), Legion, Villanova, and Mutual Indemnity (Bermuda),

Ltd. ("MIB") (collectively, the "Mutual Entities").  In order to set-up the Program, American

Patriot executed the following documents:  (1) a Proposal provided by Commonwealth Risk; (2)

a Limited Agency Agreement between Legion and American Patriot; and (3) a Shareholders

Agreement between American Patriot and Mutual Holdings (Bermuda), Ltd. ("Mutual

Holdings"), the parent company of MIB.

Under the Program, Legion acted as an insurance company, issuing workers'

compensation policies to roofing contractors on behalf of American Patriot.  As the insurer,

Legion had primary responsibility for all insured losses up to the applicable policy limits.  Each

year, Legion retained an Annual Aggregate Retention (10% of the gross written premium) to

3

in 2003.  With no objections from the Liquidator on this point, the court granted Defendants'

oral motion, and Defendants filed the deposition testimony with the court.  In response, the

Liquidator filed a Motion for Protective Orders Regarding the Transcript of Eric Bossard and

Confidentiality Agreement and Order from Reinsurance Arbitration, ("Motion for Protective

Orders" Dkt. No. 171), which has been fully briefed and is the subject of a separate order by this

court.  Finally, in July of 2006, the court granted non-party witnesses Andrew Walsh, Richard

Turner, and Glenn Partridge leave to file and brief a position paper with the court regarding

Defendants' Objections.

## FACTUAL BACKGROUND

In March of 1997, American Patriot established a "rent-a-captive" insurance program

called the Roofers Advantage Program ("the Program").  This program was marketed to

American Patriot by Mutual Risk Management, Ltd. ("Mutual Risk"), Commonwealth Risk

Services, L.P. ("Commonwealth Risk"), Legion, Villanova, and Mutual Indemnity (Bermuda),

Ltd. ("MIB") (collectively, the "Mutual Entities").  In order to set-up the Program, American

Patriot executed the following documents:  (1) a Proposal provided by Commonwealth Risk; (2)

a Limited Agency Agreement between Legion and American Patriot; and (3) a Shareholders

Agreement between American Patriot and Mutual Holdings (Bermuda), Ltd. ("Mutual

Holdings"), the parent company of MIB.

Under the Program, Legion acted as an insurance company, issuing workers'

compensation policies to roofing contractors on behalf of American Patriot.  As the insurer,

Legion had primary responsibility for all insured losses up to the applicable policy limits.  Each

year, Legion retained an Annual Aggregate Retention (10% of the gross written premium) to

in 2003.  With no objections from the Liquidator on this point, the court granted Defendants'

oral motion, and Defendants filed the deposition testimony with the court.  In response, the

Liquidator filed a Motion for Protective Orders Regarding the Transcript of Eric Bossard and

Confidentiality Agreement and Order from Reinsurance Arbitration, ("Motion for Protective

Orders" Dkt. No. 171), which has been fully briefed and is the subject of a separate order by this

court.  Finally, in July of 2006, the court granted non-party witnesses Andrew Walsh, Richard

Turner, and Glenn Partridge leave to file and brief a position paper with the court regarding

Defendants' Objections.


FACTUAL BACKGROUND

In March of 1997, American Patriot established a "rent-a-captive" insurance program

called the Roofers Advantage Program ("the Program").  This program was marketed to

American Patriot by Mutual Risk Management, Ltd. ("Mutual Risk"), Commonwealth Risk

Services, L.P. ("Commonwealth Risk"), Legion, Villanova, and Mutual Indemnity (Bermuda),

Ltd. ("MIB") (collectively, the "Mutual Entities").  In order to set-up the Program, American

Patriot executed the following documents:  (1) a Proposal provided by Commonwealth Risk; (2)

a Limited Agency Agreement between Legion and American Patriot; and (3) a Shareholders

Agreement between American Patriot and Mutual Holdings (Bermuda), Ltd. ("Mutual

Holdings"), the parent company of MIB.

Under the Program, Legion acted as an insurance company, issuing workers'

compensation policies to roofing contractors on behalf of American Patriot.  As the insurer,

Legion had primary responsibility for all insured losses up to the applicable policy limits.  Each

year, Legion retained an Annual Aggregate Retention (10% of the gross written premium) to

3

in 2003.  With no objections from the Liquidator on this point, the court granted Defendants'

oral motion, and Defendants filed the deposition testimony with the court.  In response, the

Liquidator filed a Motion for Protective Orders Regarding the Transcript of Eric Bossard and

Confidentiality Agreement and Order from Reinsurance Arbitration, ("Motion for Protective

Orders" Dkt. No. 171), which has been fully briefed and is the subject of a separate order by this

court.  Finally, in July of 2006, the court granted non-party witnesses Andrew Walsh, Richard

Turner, and Glenn Partridge leave to file and brief a position paper with the court regarding

Defendants' Objections.

FACTUAL BACKGROUND

In March of 1997, American Patriot established a "rent-a-captive" insurance program

called the Roofers Advantage Program ("the Program").  This program was marketed to

American Patriot by Mutual Risk Management, Ltd. ("Mutual Risk"), Commonwealth Risk

Services, L.P. ("Commonwealth Risk"), Legion, Villanova, and Mutual Indemnity (Bermuda),

Ltd. ("MIB") (collectively, the "Mutual Entities").  In order to set-up the Program, American

Patriot executed the following documents:  (1) a Proposal provided by Commonwealth Risk; (2)

a Limited Agency Agreement between Legion and American Patriot; and (3) a Shareholders

Agreement between American Patriot and Mutual Holdings (Bermuda), Ltd. ("Mutual

Holdings"), the parent company of MIB.

Under the Program, Legion acted as an insurance company, issuing workers'

compensation policies to roofing contractors on behalf of American Patriot.  As the insurer,

Legion had primary responsibility for all insured losses up to the applicable policy limits.  Each

year, Legion retained an Annual Aggregate Retention (10% of the gross written premium) to

3

establish the "initial working layer" of coverage for losses and expenses under the Program. Once the losses and expenses in a Program year exceeded Legion's 10% retention, however, MIB would reimburse Legion for additional losses up to the Aggregate Attachment Point, per Reinsurance Treaty 103, using money from the net ceded premium to cover its expenses. Additionally, the Shareholders Agreement provided that American Patriot would indemnify MIB if the losses exceeded the net ceded premium, but were less than the Aggregate Attachment Point. Thus, together, MIB and American Patriot provided the "second layer" of reinsurance coverage. (Conversely, the Shareholders Agreement also allowed American Patriot to recover a profit if the net ceded premium were to exceed the Program losses.) In 1998, Diane and Kenneth Hendricks assumed American Patriot's rights and obligations under the Shareholders Agreement, retroactive to 1997.

At issue in this case is the liability distribution of both parties after the Aggregate Attachment Point. Defendants claim that all amounts exceeding the Aggregate Attachment Point become the responsibility of Legion, noting that if MIB has no liability, neither American Patriot nor the Hendricks have any obligation to indemnify MIB. The Liquidator insists that, pursuant to a 1993 Amendment to Reinsurance Treaty 103, only the first $5 million of exposure above the Aggregate Attachment Point is Legion's responsibility, which it covered through outside reinsurers. The Liquidator calls this the "third layer" of reinsurance coverage. The Liquidator claims that, pursuant to the 1993 Amendment, MIB then provided an additional "fourth layer" of reinsurance coverage up to an additional $5 million on any one program, but not to exceed $10 million for all programs in a given program year. Because MIB was allegedly liable to Legion for this level of coverage, the Liquidator argues that American Patriot and the Hendricks had

establish the "initial working layer" of coverage for losses and expenses under the Program. Once the losses and expenses in a Program year exceeded Legion's 10% retention, however, MIB would reimburse Legion for additional losses up to the Aggregate Attachment Point, per Reinsurance Treaty 103, using money from the net ceded premium to cover its expenses. Additionally, the Shareholders Agreement provided that American Patriot would indemnify MIB if the losses exceeded the net ceded premium, but were less than the Aggregate Attachment Point. Thus, together, MIB and American Patriot provided the "second layer" of reinsurance coverage. (Conversely, the Shareholders Agreement also allowed American Patriot to recover a profit if the net ceded premium were to exceed the Program losses.) In 1998, Diane and Kenneth Hendricks assumed American Patriot's rights and obligations under the Shareholders Agreement, retroactive to 1997.

At issue in this case is the liability distribution of both parties after the Aggregate Attachment Point. Defendants claim that all amounts exceeding the Aggregate Attachment Point become the responsibility of Legion, noting that if MIB has no liability, neither American Patriot nor the Hendricks have any obligation to indemnify MIB. The Liquidator insists that, pursuant to a 1993 Amendment to Reinsurance Treaty 103, only the first $5 million of exposure above the Aggregate Attachment Point is Legion's responsibility, which it covered through outside reinsurers. The Liquidator calls this the "third layer" of reinsurance coverage. The Liquidator claims that, pursuant to the 1993 Amendment, MIB then provided an additional "fourth layer" of reinsurance coverage up to an additional $5 million on any one program, but not to exceed $10 million for all programs in a given program year. Because MIB was allegedly liable to Legion for this level of coverage, the Liquidator argues that American Patriot and the Hendricks had

establish the "initial working layer" of coverage for losses and expenses under the Program. Once the losses and expenses in a Program year exceeded Legion's 10% retention, however, MIB would reimburse Legion for additional losses up to the Aggregate Attachment Point, per Reinsurance Treaty 103, using money from the net ceded premium to cover its expenses. Additionally, the Shareholders Agreement provided that American Patriot would indemnify MIB if the losses exceeded the net ceded premium, but were less than the Aggregate Attachment Point. Thus, together, MIB and American Patriot provided the "second layer" of reinsurance coverage. (Conversely, the Shareholders Agreement also allowed American Patriot to recover a profit if the net ceded premium were to exceed the Program losses.) In 1998, Diane and Kenneth Hendricks assumed American Patriot's rights and obligations under the Shareholders Agreement, retroactive to 1997.

At issue in this case is the liability distribution of both parties after the Aggregate Attachment Point. Defendants claim that all amounts exceeding the Aggregate Attachment Point become the responsibility of Legion, noting that if MIB has no liability, neither American Patriot nor the Hendricks have any obligation to indemnify MIB. The Liquidator insists that, pursuant to a 1993 Amendment to Reinsurance Treaty 103, only the first $5 million of exposure above the Aggregate Attachment Point is Legion's responsibility, which it covered through outside reinsurers. The Liquidator calls this the "third layer" of reinsurance coverage. The Liquidator claims that, pursuant to the 1993 Amendment, MIB then provided an additional "fourth layer" of reinsurance coverage up to an additional $5 million on any one program, but not to exceed $10 million for all programs in a given program year. Because MIB was allegedly liable to Legion for this level of coverage, the Liquidator argues that American Patriot and the Hendricks had

establish the "initial working layer" of coverage for losses and expenses under the Program. Once the losses and expenses in a Program year exceeded Legion's 10% retention, however, MIB would reimburse Legion for additional losses up to the Aggregate Attachment Point, per Reinsurance Treaty 103, using money from the net ceded premium to cover its expenses. Additionally, the Shareholders Agreement provided that American Patriot would indemnify MIB if the losses exceeded the net ceded premium, but were less than the Aggregate Attachment Point. Thus, together, MIB and American Patriot provided the "second layer" of reinsurance coverage. (Conversely, the Shareholders Agreement also allowed American Patriot to recover a profit if the net ceded premium were to exceed the Program losses.) In 1998, Diane and Kenneth Hendricks assumed American Patriot's rights and obligations under the Shareholders Agreement, retroactive to 1997.

At issue in this case is the liability distribution of both parties after the Aggregate Attachment Point. Defendants claim that all amounts exceeding the Aggregate Attachment Point become the responsibility of Legion, noting that if MIB has no liability, neither American Patriot nor the Hendricks have any obligation to indemnify MIB. The Liquidator insists that, pursuant to a 1993 Amendment to Reinsurance Treaty 103, only the first $5 million of exposure above the Aggregate Attachment Point is Legion's responsibility, which it covered through outside reinsurers. The Liquidator calls this the "third layer" of reinsurance coverage. The Liquidator claims that, pursuant to the 1993 Amendment, MIB then provided an additional "fourth layer" of reinsurance coverage up to an additional $5 million on any one program, but not to exceed $10 million for all programs in a given program year. Because MIB was allegedly liable to Legion for this level of coverage, the Liquidator argues that American Patriot and the Hendricks had

establish the "initial working layer" of coverage for losses and expenses under the Program. Once the losses and expenses in a Program year exceeded Legion's 10% retention, however, MIB would reimburse Legion for additional losses up to the Aggregate Attachment Point, per Reinsurance Treaty 103, using money from the net ceded premium to cover its expenses. Additionally, the Shareholders Agreement provided that American Patriot would indemnify MIB if the losses exceeded the net ceded premium, but were less than the Aggregate Attachment Point. Thus, together, MIB and American Patriot provided the "second layer" of reinsurance coverage. (Conversely, the Shareholders Agreement also allowed American Patriot to recover a profit if the net ceded premium were to exceed the Program losses.) In 1998, Diane and Kenneth Hendricks assumed American Patriot's rights and obligations under the Shareholders Agreement, retroactive to 1997.

At issue in this case is the liability distribution of both parties after the Aggregate Attachment Point. Defendants claim that all amounts exceeding the Aggregate Attachment Point become the responsibility of Legion, noting that if MIB has no liability, neither American Patriot nor the Hendricks have any obligation to indemnify MIB. The Liquidator insists that, pursuant to a 1993 Amendment to Reinsurance Treaty 103, only the first $5 million of exposure above the Aggregate Attachment Point is Legion's responsibility, which it covered through outside reinsurers. The Liquidator calls this the "third layer" of reinsurance coverage. The Liquidator claims that, pursuant to the 1993 Amendment, MIB then provided an additional "fourth layer" of reinsurance coverage up to an additional $5 million on any one program, but not to exceed $10 million for all programs in a given program year. Because MIB was allegedly liable to Legion for this level of coverage, the Liquidator argues that American Patriot and the Hendricks had

potential exposure to this liability, as well.

At this point in the proceedings, the parties dispute two basic questions: (1) whether American Patriot is liable for Program losses above the Aggregate Attachment Point, pursuant to Reinsurance Treaty 103 and related Program documents, and (2) if so, whether this liability was the result of Legion's conspiracy to defraud American Patriot and the Hendricks.

In her Order of May 9, 2006, Magistrate Judge Nolan determined that these questions could and should be treated separately from one another for purposes of discovery and summary judgment. (*See* Dkt. No. 83-5, "May 9, 2006 Tr."). In order to properly set the stage for Magistrate Judge Nolan's Order, however, it is first necessary to describe in more detail the Defendants' allegations of fraud and the deponents' assertion of the attorney-client privilege.

1.    The Alleged Fraud

Both parties agree that, in February of 2000, Saran and Diane Hendricks met with Eric Bossard ("Bossard"), Vice President of Legion, and James Agnew ("Agnew"), Vice President of Commonwealth Risk, to discuss Program renewal for the year 2000. Prior to this meeting, the Program had been experiencing increasing losses and the need for adjustments in the Program reserves. Concerned about these losses, Diane Hendricks raised questions at the February 2000 meeting about the extent of her personal exposure for workers' compensation losses. Defendants allege that Diane Hendricks specifically asked "whether Patriot's ultimate liability extended only to the Aggregate Attachment Point or beyond." (Defs.' Mem. at 6). In a nuanced argument, the Liquidator alleges that Diane Hendricks only asked if she was exposed to liability "further than the letters of credit" she had already supplied to MIB. (Pl.'s Resp. at 5).

Defendants base their understanding of what transpired next on the affidavits of Bossard

potential exposure to this liability, as well.

At this point in the proceedings, the parties dispute two basic questions: (1) whether American Patriot is liable for Program losses above the Aggregate Attachment Point, pursuant to Reinsurance Treaty 103 and related Program documents, and (2) if so, whether this liability was the result of Legion's conspiracy to defraud American Patriot and the Hendricks.

In her Order of May 9, 2006, Magistrate Judge Nolan determined that these questions could and should be treated separately from one another for purposes of discovery and summary judgment. (*See* Dkt. No. 83-5, "May 9, 2006 Tr."). In order to properly set the stage for Magistrate Judge Nolan's Order, however, it is first necessary to describe in more detail the Defendants' allegations of fraud and the deponents' assertion of the attorney-client privilege.

1.      The Alleged Fraud

Both parties agree that, in February of 2000, Saran and Diane Hendricks met with Eric Bossard ("Bossard"), Vice President of Legion, and James Agnew ("Agnew"), Vice President of Commonwealth Risk, to discuss Program renewal for the year 2000. Prior to this meeting, the Program had been experiencing increasing losses and the need for adjustments in the Program reserves. Concerned about these losses, Diane Hendricks raised questions at the February 2000 meeting about the extent of her personal exposure for workers' compensation losses. Defendants allege that Diane Hendricks specifically asked "whether Patriot's ultimate liability extended only to the Aggregate Attachment Point or beyond." (Defs.' Mem. at 6). In a nuanced argument, the Liquidator alleges that Diane Hendricks only asked if she was exposed to liability "further than the letters of credit" she had already supplied to MIB. (Pl.'s Resp. at 5).

Defendants base their understanding of what transpired next on the affidavits of Bossard

potential exposure to this liability, as well.

At this point in the proceedings, the parties dispute two basic questions: (1) whether American Patriot is liable for Program losses above the Aggregate Attachment Point, pursuant to Reinsurance Treaty 103 and related Program documents, and (2) if so, whether this liability was the result of Legion's conspiracy to defraud American Patriot and the Hendricks.

In her Order of May 9, 2006, Magistrate Judge Nolan determined that these questions could and should be treated separately from one another for purposes of discovery and summary judgment. (*See* Dkt. No. 83-5, "May 9, 2006 Tr.").  In order to properly set the stage for Magistrate Judge Nolan's Order, however, it is first necessary to describe in more detail the Defendants' allegations of fraud and the deponents' assertion of the attorney-client privilege.

1.   The Alleged Fraud

Both parties agree that, in February of 2000, Saran and Diane Hendricks met with Eric Bossard ("Bossard"), Vice President of Legion, and James Agnew ("Agnew"), Vice President of Commonwealth Risk, to discuss Program renewal for the year 2000.  Prior to this meeting, the Program had been experiencing increasing losses and the need for adjustments in the Program reserves.  Concerned about these losses, Diane Hendricks raised questions at the February 2000 meeting about the extent of her personal exposure for workers' compensation losses.  Defendants allege that Diane Hendricks specifically asked "whether Patriot's ultimate liability extended only to the Aggregate Attachment Point or beyond." (Defs.' Mem. at 6).  In a nuanced argument, the Liquidator alleges that Diane Hendricks only asked if she was exposed to liability "further than the letters of credit" she had already supplied to MIB. (Pl.'s Resp. at 5).

Defendants base their understanding of what transpired next on the affidavits of Bossard

potential exposure to this liability, as well.

At this point in the proceedings, the parties dispute two basic questions: (1) whether American Patriot is liable for Program losses above the Aggregate Attachment Point, pursuant to Reinsurance Treaty 103 and related Program documents, and (2) if so, whether this liability was the result of Legion's conspiracy to defraud American Patriot and the Hendricks.

In her Order of May 9, 2006, Magistrate Judge Nolan determined that these questions could and should be treated separately from one another for purposes of discovery and summary judgment. (*See* Dkt. No. 83-5, "May 9, 2006 Tr."). In order to properly set the stage for Magistrate Judge Nolan's Order, however, it is first necessary to describe in more detail the Defendants' allegations of fraud and the deponents' assertion of the attorney-client privilege.

1.    The Alleged Fraud

Both parties agree that, in February of 2000, Saran and Diane Hendricks met with Eric Bossard ("Bossard"), Vice President of Legion, and James Agnew ("Agnew"), Vice President of Commonwealth Risk, to discuss Program renewal for the year 2000. Prior to this meeting, the Program had been experiencing increasing losses and the need for adjustments in the Program reserves. Concerned about these losses, Diane Hendricks raised questions at the February 2000 meeting about the extent of her personal exposure for workers' compensation losses. Defendants allege that Diane Hendricks specifically asked "whether Patriot's ultimate liability extended only to the Aggregate Attachment Point or beyond." (Defs.' Mem. at 6). In a nuanced argument, the Liquidator alleges that Diane Hendricks only asked if she was exposed to liability "further than the letters of credit" she had already supplied to MIB. (Pl.'s Resp. at 5).

Defendants base their understanding of what transpired next on the affidavits of Bossard

potential exposure to this liability, as well.

At this point in the proceedings, the parties dispute two basic questions: (1) whether American Patriot is liable for Program losses above the Aggregate Attachment Point, pursuant to Reinsurance Treaty 103 and related Program documents, and (2) if so, whether this liability was the result of Legion's conspiracy to defraud American Patriot and the Hendricks.

In her Order of May 9, 2006, Magistrate Judge Nolan determined that these questions could and should be treated separately from one another for purposes of discovery and summary judgment. (*See* Dkt. No. 83-5, "May 9, 2006 Tr.").  In order to properly set the stage for Magistrate Judge Nolan's Order, however, it is first necessary to describe in more detail the Defendants' allegations of fraud and the deponents' assertion of the attorney-client privilege.

1.    The Alleged Fraud

Both parties agree that, in February of 2000, Saran and Diane Hendricks met with Eric Bossard ("Bossard"), Vice President of Legion, and James Agnew ("Agnew"), Vice President of Commonwealth Risk, to discuss Program renewal for the year 2000.  Prior to this meeting, the Program had been experiencing increasing losses and the need for adjustments in the Program reserves.  Concerned about these losses, Diane Hendricks raised questions at the February 2000 meeting about the extent of her personal exposure for workers' compensation losses.  Defendants allege that Diane Hendricks specifically asked "whether Patriot's ultimate liability extended only to the Aggregate Attachment Point or beyond." (Defs.' Mem. at 6).  In a nuanced argument, the Liquidator alleges that Diane Hendricks only asked if she was exposed to liability "further than the letters of credit" she had already supplied to MIB. (Pl.'s Resp. at 5).

Defendants base their understanding of what transpired next on the affidavits of Bossard

and Agnew. Defendants allege that, in response to Diane Hendricks' questions, Agnew and Bossard met with Richard Turner ("Turner"), President of Commonwealth Risk, and Glenn Partridge ("Partridge"), Executive Vice President of Legion, to discuss American Patriot's liability beyond the Aggregate Attachment Point. Andrew Walsh ("Walsh"), Legion's in-house counsel, allegedly joined the conversation by telephone and told the men that Legion was the entity responsible for losses in excess of the Aggregate Attachment Point. Finally, Bossard, Agnew, Turner, Partridge, Walsh and David Alexander ("Alexander"), President of MIB, then allegedly determined to cook-up a plan to amend Reinsurance Treaty 103 so as to create liability for American Patriot beyond the Aggregate Attachment Point, and to convince American Patriot and/or the Hendricks to buy $1 million of reinsurance so as to cover this newly-created liability. Defendants allege that the conspirators never intended to buy this reinsurance, as they knew American Patriot was not liable for these losses in the first place.

The Liquidator argues in response that Diane Hendricks did not rely on any statements made by Bossard and Agnew in determining that she was exposed to liability beyond the letter of credit, instead relying on the opinions of Saran, attorney Karl Leo (on American Patriot's Board of Directors), and Scott Thomas (of Patriot Underwriting, Inc.). The Liquidator also argues that the 1993 amendment to Reinsurance Treaty 103 added a fourth layer of exposure "in the amount of $5 million per program in any one given treaty year and $10 million for all programs for a given treaty year." (Pl.'s Resp. at 6). The Liquidator asserts that, per the 1993 amendment, MIB is responsible for this layer of coverage, thus American Patriot and the Hendricks are exposed to liability at this level. Lastly, the Liquidator argues that neither Legion nor MIB would have had anything to gain from perpetrating the alleged fraud. It is undisputed that American Patriot and

and Agnew. Defendants allege that, in response to Diane Hendricks' questions, Agnew and Bossard met with Richard Turner ("Turner"), President of Commonwealth Risk, and Glenn Partridge ("Partridge"), Executive Vice President of Legion, to discuss American Patriot's liability beyond the Aggregate Attachment Point. Andrew Walsh ("Walsh"), Legion's in-house counsel, allegedly joined the conversation by telephone and told the men that Legion was the entity responsible for losses in excess of the Aggregate Attachment Point. Finally, Bossard, Agnew, Turner, Partridge, Walsh and David Alexander ("Alexander"), President of MIB, then allegedly determined to cook-up a plan to amend Reinsurance Treaty 103 so as to create liability for American Patriot beyond the Aggregate Attachment Point, and to convince American Patriot and/or the Hendricks to buy $1 million of reinsurance so as to cover this newly-created liability. Defendants allege that the conspirators never intended to buy this reinsurance, as they knew American Patriot was not liable for these losses in the first place.

The Liquidator argues in response that Diane Hendricks did not rely on any statements made by Bossard and Agnew in determining that she was exposed to liability beyond the letter of credit, instead relying on the opinions of Saran, attorney Karl Leo (on American Patriot's Board of Directors), and Scott Thomas (of Patriot Underwriting, Inc.). The Liquidator also argues that the 1993 amendment to Reinsurance Treaty 103 added a fourth layer of exposure "in the amount of $5 million per program in any one given treaty year and $10 million for all programs for a given treaty year." (Pl.'s Resp. at 6). The Liquidator asserts that, per the 1993 amendment, MIB is responsible for this layer of coverage, thus American Patriot and the Hendricks are exposed to liability at this level. Lastly, the Liquidator argues that neither Legion nor MIB would have had anything to gain from perpetrating the alleged fraud. It is undisputed that American Patriot and

and Agnew.  Defendants allege that, in response to Diane Hendricks' questions, Agnew and Bossard met with Richard Turner ("Turner"), President of Commonwealth Risk, and Glenn Partridge ("Partridge"), Executive Vice President of Legion, to discuss American Patriot's liability beyond the Aggregate Attachment Point.  Andrew Walsh ("Walsh"), Legion's in-house counsel, allegedly joined the conversation by telephone and told the men that Legion was the entity responsible for losses in excess of the Aggregate Attachment Point.  Finally, Bossard, Agnew, Turner, Partridge, Walsh and David Alexander ("Alexander"), President of MIB, then allegedly determined to cook-up a plan to amend Reinsurance Treaty 103 so as to create liability for American Patriot beyond the Aggregate Attachment Point, and to convince American Patriot and/or the Hendricks to buy $1 million of reinsurance so as to cover this newly-created liability. Defendants allege that the conspirators never intended to buy this reinsurance, as they knew American Patriot was not liable for these losses in the first place.

The Liquidator argues in response that Diane Hendricks did not rely on any statements made by Bossard and Agnew in determining that she was exposed to liability beyond the letter of credit, instead relying on the opinions of Saran, attorney Karl Leo (on American Patriot's Board of Directors), and Scott Thomas (of Patriot Underwriting, Inc.).  The Liquidator also argues that the 1993 amendment to Reinsurance Treaty 103 added a fourth layer of exposure "in the amount of $5 million per program in any one given treaty year and $10 million for all programs for a given treaty year."  (Pl.'s Resp. at 6).  The Liquidator asserts that, per the 1993 amendment, MIB is responsible for this layer of coverage, thus American Patriot and the Hendricks are exposed to liability at this level.  Lastly, the Liquidator argues that neither Legion nor MIB would have had anything to gain from perpetrating the alleged fraud.  It is undisputed that American Patriot and

and Agnew. Defendants allege that, in response to Diane Hendricks' questions, Agnew and Bossard met with Richard Turner ("Turner"), President of Commonwealth Risk, and Glenn Partridge ("Partridge"), Executive Vice President of Legion, to discuss American Patriot's liability beyond the Aggregate Attachment Point. Andrew Walsh ("Walsh"), Legion's in-house counsel, allegedly joined the conversation by telephone and told the men that Legion was the entity responsible for losses in excess of the Aggregate Attachment Point. Finally, Bossard, Agnew, Turner, Partridge, Walsh and David Alexander ("Alexander"), President of MIB, then allegedly determined to cook-up a plan to amend Reinsurance Treaty 103 so as to create liability for American Patriot beyond the Aggregate Attachment Point, and to convince American Patriot and/or the Hendricks to buy $1 million of reinsurance so as to cover this newly-created liability. Defendants allege that the conspirators never intended to buy this reinsurance, as they knew American Patriot was not liable for these losses in the first place.

The Liquidator argues in response that Diane Hendricks did not rely on any statements made by Bossard and Agnew in determining that she was exposed to liability beyond the letter of credit, instead relying on the opinions of Saran, attorney Karl Leo (on American Patriot's Board of Directors), and Scott Thomas (of Patriot Underwriting, Inc.). The Liquidator also argues that the 1993 amendment to Reinsurance Treaty 103 added a fourth layer of exposure "in the amount of $5 million per program in any one given treaty year and $10 million for all programs for a given treaty year." (Pl.'s Resp. at 6). The Liquidator asserts that, per the 1993 amendment, MIB is responsible for this layer of coverage, thus American Patriot and the Hendricks are exposed to liability at this level. Lastly, the Liquidator argues that neither Legion nor MIB would have had anything to gain from perpetrating the alleged fraud. It is undisputed that American Patriot and

and Agnew. Defendants allege that, in response to Diane Hendricks' questions, Agnew and Bossard met with Richard Turner ("Turner"), President of Commonwealth Risk, and Glenn Partridge ("Partridge"), Executive Vice President of Legion, to discuss American Patriot's liability beyond the Aggregate Attachment Point. Andrew Walsh ("Walsh"), Legion's in-house counsel, allegedly joined the conversation by telephone and told the men that Legion was the entity responsible for losses in excess of the Aggregate Attachment Point. Finally, Bossard, Agnew, Turner, Partridge, Walsh and David Alexander ("Alexander"), President of MIB, then allegedly determined to cook-up a plan to amend Reinsurance Treaty 103 so as to create liability for American Patriot beyond the Aggregate Attachment Point, and to convince American Patriot and/or the Hendricks to buy $1 million of reinsurance so as to cover this newly-created liability. Defendants allege that the conspirators never intended to buy this reinsurance, as they knew American Patriot was not liable for these losses in the first place.

The Liquidator argues in response that Diane Hendricks did not rely on any statements made by Bossard and Agnew in determining that she was exposed to liability beyond the letter of credit, instead relying on the opinions of Saran, attorney Karl Leo (on American Patriot's Board of Directors), and Scott Thomas (of Patriot Underwriting, Inc.). The Liquidator also argues that the 1993 amendment to Reinsurance Treaty 103 added a fourth layer of exposure "in the amount of $5 million per program in any one given treaty year and $10 million for all programs for a given treaty year." (Pl.'s Resp. at 6). The Liquidator asserts that, per the 1993 amendment, MIB is responsible for this layer of coverage, thus American Patriot and the Hendricks are exposed to liability at this level. Lastly, the Liquidator argues that neither Legion nor MIB would have had anything to gain from perpetrating the alleged fraud. It is undisputed that American Patriot and

the Hendricks entered into a letter agreement with MIB on April 20, 2000, thereby capping the Hendricks' liability for a provisional premium of $480,000.

2.      Discovery Proceedings and Magistrate Judge Nolan's May 9, 2006 Order

In March of 2006, Defendants deposed non-party witnesses Walsh and Turner. At the depositions, the Liquidator asserted her rights to Legion's attorney-client privilege and cautioned both deponents that the privilege was not theirs to waive. At the Liquidator's urging, Walsh and Turner were instructed by their counsel not to answer a number of questions pertaining to the alleged fraud, specifically questions about the alleged conference call in February of 2000, the alleged amendments of Program documents, and whether efforts had been made to purchase reinsurance for Diane Hendricks. The parties eventually stipulated that their positions were not likely to change with respect to inquiries into the alleged fraud, and the parties agreed to postpone Partridge's deposition until the question of privilege had been resolved.

Consequently, Defendants filed their Motion to Overrule Claim of Attorney-Client Privilege and to Compel Responses to Deposition Questions and Other Discovery. ("Motion" Dkt. No. 62). On May 9, 2006 Magistrate Judge Nolan denied Defendants' Motion without prejudice, "for the reasons stated in open court." (Dkt. No. 77). Magistrate Judge Nolan found Defendants' Motion to be premature, stating "the underlying problem here is you want me to look at crime/fraud and I am telling you I can't do it without first deciding who is right." (May 9, 2006 Tr. at 16). Magistrate Judge Nolan then bifurcated the discovery process, determining that discovery on the crime/fraud issue "has to wait until a ruling on what I am calling the issue of the case, which is the parties' differing interpretations of the liability distribution." (*Id.* at 22). Significantly, Magistrate Judge Nolan declined to rule on the substance of Defendants' motion,

the Hendricks entered into a letter agreement with MIB on April 20, 2000, thereby capping the Hendricks' liability for a provisional premium of $480,000.

2.    Discovery Proceedings and Magistrate Judge Nolan's May 9, 2006 Order

In March of 2006, Defendants deposed non-party witnesses Walsh and Turner.  At the depositions, the Liquidator asserted her rights to Legion's attorney-client privilege and cautioned both deponents that the privilege was not theirs to waive.  At the Liquidator's urging, Walsh and Turner were instructed by their counsel not to answer a number of questions pertaining to the alleged fraud, specifically questions about the alleged conference call in February of 2000, the alleged amendments of Program documents, and whether efforts had been made to purchase reinsurance for Diane Hendricks.  The parties eventually stipulated that their positions were not likely to change with respect to inquiries into the alleged fraud, and the parties agreed to postpone Partridge's deposition until the question of privilege had been resolved.

Consequently, Defendants filed their Motion to Overrule Claim of Attorney-Client Privilege and to Compel Responses to Deposition Questions and Other Discovery.  ("Motion" Dkt. No. 62).  On May 9, 2006 Magistrate Judge Nolan denied Defendants' Motion without prejudice, "for the reasons stated in open court."  (Dkt. No. 77).  Magistrate Judge Nolan found Defendants' Motion to be premature, stating "the underlying problem here is you want me to look at crime/fraud and I am telling you I can't do it without first deciding who is right."  (May 9, 2006 Tr. at 16).  Magistrate Judge Nolan then bifurcated the discovery process, determining that discovery on the crime/fraud issue "has to wait until a ruling on what I am calling the issue of the case, which is the parties' differing interpretations of the liability distribution."  (*Id.* at 22). Significantly, Magistrate Judge Nolan declined to rule on the substance of Defendants' motion,

the Hendricks entered into a letter agreement with MIB on April 20, 2000, thereby capping the Hendricks' liability for a provisional premium of $480,000.

2.    Discovery Proceedings and Magistrate Judge Nolan's May 9, 2006 Order

In March of 2006, Defendants deposed non-party witnesses Walsh and Turner. At the depositions, the Liquidator asserted her rights to Legion's attorney-client privilege and cautioned both deponents that the privilege was not theirs to waive. At the Liquidator's urging, Walsh and Turner were instructed by their counsel not to answer a number of questions pertaining to the alleged fraud, specifically questions about the alleged conference call in February of 2000, the alleged amendments of Program documents, and whether efforts had been made to purchase reinsurance for Diane Hendricks. The parties eventually stipulated that their positions were not likely to change with respect to inquiries into the alleged fraud, and the parties agreed to postpone Partridge's deposition until the question of privilege had been resolved.

Consequently, Defendants filed their Motion to Overrule Claim of Attorney-Client Privilege and to Compel Responses to Deposition Questions and Other Discovery. ("Motion" Dkt. No. 62). On May 9, 2006 Magistrate Judge Nolan denied Defendants' Motion without prejudice, "for the reasons stated in open court." (Dkt. No. 77). Magistrate Judge Nolan found Defendants' Motion to be premature, stating "the underlying problem here is you want me to look at crime/fraud and I am telling you I can't do it without first deciding who is right." (May 9, 2006 Tr. at 16). Magistrate Judge Nolan then bifurcated the discovery process, determining that discovery on the crime/fraud issue "has to wait until a ruling on what I am calling the issue of the case, which is the parties' differing interpretations of the liability distribution." (*Id.* at 22). Significantly, Magistrate Judge Nolan declined to rule on the substance of Defendants' motion,

the Hendricks entered into a letter agreement with MIB on April 20, 2000, thereby capping the Hendricks' liability for a provisional premium of $480,000.

2.      Discovery Proceedings and Magistrate Judge Nolan's May 9, 2006 Order

In March of 2006, Defendants deposed non-party witnesses Walsh and Turner. At the depositions, the Liquidator asserted her rights to Legion's attorney-client privilege and cautioned both deponents that the privilege was not theirs to waive. At the Liquidator's urging, Walsh and Turner were instructed by their counsel not to answer a number of questions pertaining to the alleged fraud, specifically questions about the alleged conference call in February of 2000, the alleged amendments of Program documents, and whether efforts had been made to purchase reinsurance for Diane Hendricks. The parties eventually stipulated that their positions were not likely to change with respect to inquiries into the alleged fraud, and the parties agreed to postpone Partridge's deposition until the question of privilege had been resolved.

Consequently, Defendants filed their Motion to Overrule Claim of Attorney-Client Privilege and to Compel Responses to Deposition Questions and Other Discovery. ("Motion" Dkt. No. 62). On May 9, 2006 Magistrate Judge Nolan denied Defendants' Motion without prejudice, "for the reasons stated in open court." (Dkt. No. 77). Magistrate Judge Nolan found Defendants' Motion to be premature, stating "the underlying problem here is you want me to look at crime/fraud and I am telling you I can't do it without first deciding who is right." (May 9, 2006 Tr. at 16). Magistrate Judge Nolan then bifurcated the discovery process, determining that discovery on the crime/fraud issue "has to wait until a ruling on what I am calling the issue of the case, which is the parties' differing interpretations of the liability distribution." (*Id.* at 22). Significantly, Magistrate Judge Nolan declined to rule on the substance of Defendants' motion,

the Hendricks entered into a letter agreement with MIB on April 20, 2000, thereby capping the Hendricks' liability for a provisional premium of $480,000.

2.      Discovery Proceedings and Magistrate Judge Nolan's May 9, 2006 Order

In March of 2006, Defendants deposed non-party witnesses Walsh and Turner. At the depositions, the Liquidator asserted her rights to Legion's attorney-client privilege and cautioned both deponents that the privilege was not theirs to waive. At the Liquidator's urging, Walsh and Turner were instructed by their counsel not to answer a number of questions pertaining to the alleged fraud, specifically questions about the alleged conference call in February of 2000, the alleged amendments of Program documents, and whether efforts had been made to purchase reinsurance for Diane Hendricks. The parties eventually stipulated that their positions were not likely to change with respect to inquiries into the alleged fraud, and the parties agreed to postpone Partridge's deposition until the question of privilege had been resolved.

Consequently, Defendants filed their Motion to Overrule Claim of Attorney-Client Privilege and to Compel Responses to Deposition Questions and Other Discovery. ("Motion" Dkt. No. 62). On May 9, 2006 Magistrate Judge Nolan denied Defendants' Motion without prejudice, "for the reasons stated in open court." (Dkt. No. 77). Magistrate Judge Nolan found Defendants' Motion to be premature, stating "the underlying problem here is you want me to look at crime/fraud and I am telling you I can't do it without first deciding who is right." (May 9, 2006 Tr. at 16). Magistrate Judge Nolan then bifurcated the discovery process, determining that discovery on the crime/fraud issue "has to wait until a ruling on what I am calling the issue of the case, which is the parties' differing interpretations of the liability distribution." (*Id.* at 22). Significantly, Magistrate Judge Nolan declined to rule on the substance of Defendants' motion,

instead specifically inviting Defendants to "raise the issue as soon as summary judgment is made." (*Id.* at 16-17).

Defendants ask that the court overrule Magistrate Judge Nolan's Order and find that a *prima facie* case of fraud has already been set forth and the attorney-client privilege cannot stand. (Defs.' Mem. at 4). Alternatively, "if this Court agrees that the issue is not yet ripe," Defendants request an amendment of the existing case management order to permit dispositive motions on the document interpretation issues, followed by a second discovery period (if necessary). (*Id.* at 22). Because the court already vacated the scheduling order for this case in June of 2006, (Dkt. No. 101), Defendants' request to amend the existing case management schedule is denied as moot.

## STANDARD OF REVIEW

This case was referred to Magistrate Judge Nolan for purposes of pretrial discovery supervision and settlement conference. (Dkt. No. 56). Pursuant to 28 U.S.C. § 636(b)(1)(A), the district court may reconsider Magistrate Judge Nolan's nondispositive ruling only if it "has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *See Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 661 (7th Cir. 1998); *see also United States v. Brown*, 79 F.3d 1499, 1503 (7th Cir. 1996). "Clear error is an extremely deferential standard of review, and will only be found to exist where the 'reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)). A reviewing court may not reverse a decision simply because it would have come to a different conclusion. *Id.*

instead specifically inviting Defendants to "raise the issue as soon as summary judgment is made." (*Id.* at 16-17).

Defendants ask that the court overrule Magistrate Judge Nolan's Order and find that a *prima facie* case of fraud has already been set forth and the attorney-client privilege cannot stand. (Defs.' Mem. at 4). Alternatively, "if this Court agrees that the issue is not yet ripe," Defendants request an amendment of the existing case management order to permit dispositive motions on the document interpretation issues, followed by a second discovery period (if necessary). (*Id.* at 22). Because the court already vacated the scheduling order for this case in June of 2006, (Dkt. No. 101), Defendants' request to amend the existing case management schedule is denied as moot.

STANDARD OF REVIEW

This case was referred to Magistrate Judge Nolan for purposes of pretrial discovery supervision and settlement conference. (Dkt. No. 56). Pursuant to 28 U.S.C. § 636(b)(1)(A), the district court may reconsider Magistrate Judge Nolan's nondispositive ruling only if it "has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *See Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 661 (7th Cir. 1998); *see also United States v. Brown*, 79 F.3d 1499, 1503 (7th Cir. 1996). "Clear error is an extremely deferential standard of review, and will only be found to exist where the 'reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)). A reviewing court may not reverse a decision simply because it would have come to a different conclusion. *Id.*

instead specifically inviting Defendants to "raise the issue as soon as summary judgment is made." (*Id.* at 16-17).

Defendants ask that the court overrule Magistrate Judge Nolan's Order and find that a *prima facie* case of fraud has already been set forth and the attorney-client privilege cannot stand. (Defs.' Mem. at 4). Alternatively, "if this Court agrees that the issue is not yet ripe," Defendants request an amendment of the existing case management order to permit dispositive motions on the document interpretation issues, followed by a second discovery period (if necessary). (*Id.* at 22). Because the court already vacated the scheduling order for this case in June of 2006, (Dkt. No. 101), Defendants' request to amend the existing case management schedule is denied as moot.

STANDARD OF REVIEW

This case was referred to Magistrate Judge Nolan for purposes of pretrial discovery supervision and settlement conference. (Dkt. No. 56). Pursuant to 28 U.S.C. § 636(b)(1)(A), the district court may reconsider Magistrate Judge Nolan's nondispositive ruling only if it "has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *See Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 661 (7th Cir. 1998); *see also United States v. Brown*, 79 F.3d 1499, 1503 (7th Cir. 1996). "Clear error is an extremely deferential standard of review, and will only be found to exist where the 'reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)). A reviewing court may not reverse a decision simply because it would have come to a different conclusion. *Id.*

instead specifically inviting Defendants to "raise the issue as soon as summary judgment is made." (*Id.* at 16-17).

Defendants ask that the court overrule Magistrate Judge Nolan's Order and find that a *prima facie* case of fraud has already been set forth and the attorney-client privilege cannot stand. (Defs.' Mem. at 4). Alternatively, "if this Court agrees that the issue is not yet ripe," Defendants request an amendment of the existing case management order to permit dispositive motions on the document interpretation issues, followed by a second discovery period (if necessary). (*Id.* at 22). Because the court already vacated the scheduling order for this case in June of 2006, (Dkt. No. 101), Defendants' request to amend the existing case management schedule is denied as moot.

STANDARD OF REVIEW

This case was referred to Magistrate Judge Nolan for purposes of pretrial discovery supervision and settlement conference. (Dkt. No. 56). Pursuant to 28 U.S.C. § 636(b)(1)(A), the district court may reconsider Magistrate Judge Nolan's nondispositive ruling only if it "has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *See Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 661 (7th Cir. 1998); *see also United States v. Brown*, 79 F.3d 1499, 1503 (7th Cir. 1996). "Clear error is an extremely deferential standard of review, and will only be found to exist where the 'reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)). A reviewing court may not reverse a decision simply because it would have come to a different conclusion. *Id.*

instead specifically inviting Defendants to "raise the issue as soon as summary judgment is made." (*Id.* at 16-17).

Defendants ask that the court overrule Magistrate Judge Nolan's Order and find that a *prima facie* case of fraud has already been set forth and the attorney-client privilege cannot stand. (Defs.' Mem. at 4). Alternatively, "if this Court agrees that the issue is not yet ripe," Defendants request an amendment of the existing case management order to permit dispositive motions on the document interpretation issues, followed by a second discovery period (if necessary). (*Id.* at 22). Because the court already vacated the scheduling order for this case in June of 2006, (Dkt. No. 101), Defendants' request to amend the existing case management schedule is denied as moot.

<u>STANDARD OF REVIEW</u>

This case was referred to Magistrate Judge Nolan for purposes of pretrial discovery supervision and settlement conference. (Dkt. No. 56). Pursuant to 28 U.S.C. § 636(b)(1)(A), the district court may reconsider Magistrate Judge Nolan's nondispositive ruling only if it "has been shown that the magistrate judge's order is clearly erroneous or contrary to law." *See Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 661 (7th Cir. 1998); *see also United States v. Brown*, 79 F.3d 1499, 1503 (7th Cir. 1996). "Clear error is an extremely deferential standard of review, and will only be found to exist where the 'reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)). A reviewing court may not reverse a decision simply because it would have come to a different conclusion. *Id.*

ANALYSIS

In memoranda reaching a combined total of over one hundred pages, the parties generally reiterate their positions on the questions of privilege and liability, addressing numerous pages to such topics as: which party did or did not satisfy its burden of proof or persuasion on the question of fraud; whether the attorney-client privilege was properly asserted, and whether it was waived by the Liquidator or Legion or both; and the extent of American Patriot's liability under Reinsurance Treaty 103 before and after the alleged fraud.

However, it is important to remember that this court's review of Magistrate Judge Nolan's Order is couched in extremely deferential terms. Unless the court finds that Magistrate Judge Nolan's Order was clearly erroneous, as discussed above, her Order will stand. In her May 9, 2006 Order, Magistrate Judge Nolan intentionally saved the question of privilege for another day, having determined that she could not rule on this issue without also making a substantive ruling on the question of liability. Magistrate Judge Nolan therefore determined that it was appropriate to bifurcate discovery so as to allow the district court to address the question of the parties' underlying liability before proceeding with the question of privilege. If appropriate, Magistrate Judge Nolan felt the privilege question would then be "ripe" for a ruling in her courtroom. (May 9, 2006 Tr. at 18).

Defendants articulate four main arguments specifically addressing Magistrate Judge Nolan's Order: 1) Defendants' Motion was not premature; 2) Magistrate Judge Nolan's Order goes against this court's determination that discovery should proceed on the affirmative defense of fraud; 3) the district court cannot properly interpret the parties' contractual liability without

ANALYSIS

In memoranda reaching a combined total of over one hundred pages, the parties generally reiterate their positions on the questions of privilege and liability, addressing numerous pages to such topics as: which party did or did not satisfy its burden of proof or persuasion on the question of fraud; whether the attorney-client privilege was properly asserted, and whether it was waived by the Liquidator or Legion or both; and the extent of American Patriot's liability under Reinsurance Treaty 103 before and after the alleged fraud.

However, it is important to remember that this court's review of Magistrate Judge Nolan's Order is couched in extremely deferential terms. Unless the court finds that Magistrate Judge Nolan's Order was clearly erroneous, as discussed above, her Order will stand. In her May 9, 2006 Order, Magistrate Judge Nolan intentionally saved the question of privilege for another day, having determined that she could not rule on this issue without also making a substantive ruling on the question of liability. Magistrate Judge Nolan therefore determined that it was appropriate to bifurcate discovery so as to allow the district court to address the question of the parties' underlying liability before proceeding with the question of privilege. If appropriate, Magistrate Judge Nolan felt the privilege question would then be "ripe" for a ruling in her courtroom. (May 9, 2006 Tr. at 18).

Defendants articulate four main arguments specifically addressing Magistrate Judge Nolan's Order: 1) Defendants' Motion was not premature; 2) Magistrate Judge Nolan's Order goes against this court's determination that discovery should proceed on the affirmative defense of fraud; 3) the district court cannot properly interpret the parties' contractual liability without

In memoranda reaching a combined total of over one hundred pages, the parties generally reiterate their positions on the questions of privilege and liability, addressing numerous pages to such topics as: which party did or did not satisfy its burden of proof or persuasion on the question of fraud; whether the attorney-client privilege was properly asserted, and whether it was waived by the Liquidator or Legion or both; and the extent of American Patriot's liability under Reinsurance Treaty 103 before and after the alleged fraud.

However, it is important to remember that this court's review of Magistrate Judge Nolan's Order is couched in extremely deferential terms. Unless the court finds that Magistrate Judge Nolan's Order was clearly erroneous, as discussed above, her Order will stand. In her May 9, 2006 Order, Magistrate Judge Nolan intentionally saved the question of privilege for another day, having determined that she could not rule on this issue without also making a substantive ruling on the question of liability. Magistrate Judge Nolan therefore determined that it was appropriate to bifurcate discovery so as to allow the district court to address the question of the parties' underlying liability before proceeding with the question of privilege. If appropriate, Magistrate Judge Nolan felt the privilege question would then be "ripe" for a ruling in her courtroom. (May 9, 2006 Tr. at 18).

Defendants articulate four main arguments specifically addressing Magistrate Judge Nolan's Order: 1) Defendants' Motion was not premature; 2) Magistrate Judge Nolan's Order goes against this court's determination that discovery should proceed on the affirmative defense of fraud; 3) the district court cannot properly interpret the parties' contractual liability without

ANALYSIS

In memoranda reaching a combined total of over one hundred pages, the parties generally reiterate their positions on the questions of privilege and liability, addressing numerous pages to such topics as: which party did or did not satisfy its burden of proof or persuasion on the question of fraud; whether the attorney-client privilege was properly asserted, and whether it was waived by the Liquidator or Legion or both; and the extent of American Patriot's liability under Reinsurance Treaty 103 before and after the alleged fraud.

However, it is important to remember that this court's review of Magistrate Judge Nolan's Order is couched in extremely deferential terms. Unless the court finds that Magistrate Judge Nolan's Order was clearly erroneous, as discussed above, her Order will stand. In her May 9, 2006 Order, Magistrate Judge Nolan intentionally saved the question of privilege for another day, having determined that she could not rule on this issue without also making a substantive ruling on the question of liability. Magistrate Judge Nolan therefore determined that it was appropriate to bifurcate discovery so as to allow the district court to address the question of the parties' underlying liability before proceeding with the question of privilege. If appropriate, Magistrate Judge Nolan felt the privilege question would then be "ripe" for a ruling in her courtroom. (May 9, 2006 Tr. at 18).

Defendants articulate four main arguments specifically addressing Magistrate Judge Nolan's Order: 1) Defendants' Motion was not premature; 2) Magistrate Judge Nolan's Order goes against this court's determination that discovery should proceed on the affirmative defense of fraud; 3) the district court cannot properly interpret the parties' contractual liability without

ANALYSIS

In memoranda reaching a combined total of over one hundred pages, the parties generally reiterate their positions on the questions of privilege and liability, addressing numerous pages to such topics as: which party did or did not satisfy its burden of proof or persuasion on the question of fraud; whether the attorney-client privilege was properly asserted, and whether it was waived by the Liquidator or Legion or both; and the extent of American Patriot's liability under Reinsurance Treaty 103 before and after the alleged fraud.

However, it is important to remember that this court's review of Magistrate Judge Nolan's Order is couched in extremely deferential terms. Unless the court finds that Magistrate Judge Nolan's Order was clearly erroneous, as discussed above, her Order will stand. In her May 9, 2006 Order, Magistrate Judge Nolan intentionally saved the question of privilege for another day, having determined that she could not rule on this issue without also making a substantive ruling on the question of liability. Magistrate Judge Nolan therefore determined that it was appropriate to bifurcate discovery so as to allow the district court to address the question of the parties' underlying liability before proceeding with the question of privilege. If appropriate, Magistrate Judge Nolan felt the privilege question would then be "ripe" for a ruling in her courtroom. (May 9, 2006 Tr. at 18).

Defendants articulate four main arguments specifically addressing Magistrate Judge Nolan's Order: 1) Defendants' Motion was not premature; 2) Magistrate Judge Nolan's Order goes against this court's determination that discovery should proceed on the affirmative defense of fraud; 3) the district court cannot properly interpret the parties' contractual liability without

pertinent discovery into the intent of the drafting parties; and 4) there is no vehicle through which the question of liability is likely to be brought before the district court. On her part, the Liquidator states that she "takes no position with respect to the Magistrate's bifurcation of discovery." (Pl.'s Resp. at 30 n.19).

Defendants first argue that their Motion to Overrule was not premature because American Patriot "provided uncontradicted testimony of the fraud discussions." (Defs.' Mem. at 4). Despite American Patriot's evidence, Magistrate Judge Nolan determined that the Motion as a whole was not "ripe," and that it could not be decided until the underlying question of liability was determined by the district court. It is clear to this court that a determination of the liability distribution under Reinsurance Treaty 103 and related Program documents would certainly assist Magistrate Judge Nolan in framing the question of privilege. To flesh out this viewpoint, if the district court were to determine that American Patriot is not liable under Reinsurance Treaty 103 and related Program documents, there would be no reason to delve into claimed privileges regarding these documents. Instead, if relevant, the fraud question would be limited to Defendants' theory that Legion and the Mutual entities fraudulently represented to Diane Hendricks that this non-existent liability in fact existed. On the other hand, if the court were to find that American Patriot is liable under Reinsurance Treaty 103 and related Program documents, Magistrate Judge Nolan would then stand ready to address the need for further discovery based on the fraud defense to this liability. In either event, the scope of the alleged fraud (and thus the scope of the exception to the attorney-client privilege) would depend upon the court's determination of the parties' liability. The court does not find this reasoning to be clearly erroneous.

pertinent discovery into the intent of the drafting parties; and 4) there is no vehicle through which the question of liability is likely to be brought before the district court.  On her part, the Liquidator states that she "takes no position with respect to the Magistrate's bifurcation of discovery."  (Pl.'s Resp. at 30 n.19).

Defendants first argue that their Motion to Overrule was not premature because American Patriot "provided uncontradicted testimony of the fraud discussions."  (Defs.' Mem. at 4).  Despite American Patriot's evidence, Magistrate Judge Nolan determined that the Motion as a whole was not "ripe," and that it could not be decided until the underlying question of liability was determined by the district court.  It is clear to this court that a determination of the liability distribution under Reinsurance Treaty 103 and related Program documents would certainly assist Magistrate Judge Nolan in framing the question of privilege.  To flesh out this viewpoint, if the district court were to determine that American Patriot is not liable under Reinsurance Treaty 103 and related Program documents, there would be no reason to delve into claimed privileges regarding these documents.  Instead, if relevant, the fraud question would be limited to Defendants' theory that Legion and the Mutual entities fraudulently represented to Diane Hendricks that this non-existent liability in fact existed.  On the other hand, if the court were to find that American Patriot is liable under Reinsurance Treaty 103 and related Program documents, Magistrate Judge Nolan would then stand ready to address the need for further discovery based on the fraud defense to this liability.  In either event, the scope of the alleged fraud (and thus the scope of the exception to the attorney-client privilege) would depend upon the court's determination of the parties' liability.  The court does not find this reasoning to be clearly erroneous.

pertinent discovery into the intent of the drafting parties; and 4) there is no vehicle through which the question of liability is likely to be brought before the district court. On her part, the Liquidator states that she "takes no position with respect to the Magistrate's bifurcation of discovery." (Pl.'s Resp. at 30 n.19).

Defendants first argue that their Motion to Overrule was not premature because American Patriot "provided uncontradicted testimony of the fraud discussions." (Defs.' Mem. at 4). Despite American Patriot's evidence, Magistrate Judge Nolan determined that the Motion as a whole was not "ripe," and that it could not be decided until the underlying question of liability was determined by the district court. It is clear to this court that a determination of the liability distribution under Reinsurance Treaty 103 and related Program documents would certainly assist Magistrate Judge Nolan in framing the question of privilege. To flesh out this viewpoint, if the district court were to determine that American Patriot is not liable under Reinsurance Treaty 103 and related Program documents, there would be no reason to delve into claimed privileges regarding these documents. Instead, if relevant, the fraud question would be limited to Defendants' theory that Legion and the Mutual entities fraudulently represented to Diane Hendricks that this non-existent liability in fact existed. On the other hand, if the court were to find that American Patriot is liable under Reinsurance Treaty 103 and related Program documents, Magistrate Judge Nolan would then stand ready to address the need for further discovery based on the fraud defense to this liability. In either event, the scope of the alleged fraud (and thus the scope of the exception to the attorney-client privilege) would depend upon the court's determination of the parties' liability. The court does not find this reasoning to be clearly erroneous.

pertinent discovery into the intent of the drafting parties; and 4) there is no vehicle through which the question of liability is likely to be brought before the district court.  On her part, the Liquidator states that she "takes no position with respect to the Magistrate's bifurcation of discovery."  (Pl.'s Resp. at 30 n.19).

Defendants first argue that their Motion to Overrule was not premature because American Patriot "provided uncontradicted testimony of the fraud discussions."  (Defs.' Mem. at 4).  Despite American Patriot's evidence, Magistrate Judge Nolan determined that the Motion as a whole was not "ripe," and that it could not be decided until the underlying question of liability was determined by the district court.  It is clear to this court that a determination of the liability distribution under Reinsurance Treaty 103 and related Program documents would certainly assist Magistrate Judge Nolan in framing the question of privilege.  To flesh out this viewpoint, if the district court were to determine that American Patriot is not liable under Reinsurance Treaty 103 and related Program documents, there would be no reason to delve into claimed privileges regarding these documents.  Instead, if relevant, the fraud question would be limited to Defendants' theory that Legion and the Mutual entities fraudulently represented to Diane Hendricks that this non-existent liability in fact existed.  On the other hand, if the court were to find that American Patriot is liable under Reinsurance Treaty 103 and related Program documents, Magistrate Judge Nolan would then stand ready to address the need for further discovery based on the fraud defense to this liability.  In either event, the scope of the alleged fraud (and thus the scope of the exception to the attorney-client privilege) would depend upon the court's determination of the parties' liability.  The court does not find this reasoning to be clearly erroneous.

pertinent discovery into the intent of the drafting parties; and 4) there is no vehicle through which the question of liability is likely to be brought before the district court. On her part, the Liquidator states that she "takes no position with respect to the Magistrate's bifurcation of discovery." (Pl.'s Resp. at 30 n.19).

Defendants first argue that their Motion to Overrule was not premature because American Patriot "provided uncontradicted testimony of the fraud discussions." (Defs.' Mem. at 4). Despite American Patriot's evidence, Magistrate Judge Nolan determined that the Motion as a whole was not "ripe," and that it could not be decided until the underlying question of liability was determined by the district court. It is clear to this court that a determination of the liability distribution under Reinsurance Treaty 103 and related Program documents would certainly assist Magistrate Judge Nolan in framing the question of privilege. To flesh out this viewpoint, if the district court were to determine that American Patriot is not liable under Reinsurance Treaty 103 and related Program documents, there would be no reason to delve into claimed privileges regarding these documents. Instead, if relevant, the fraud question would be limited to Defendants' theory that Legion and the Mutual entities fraudulently represented to Diane Hendricks that this non-existent liability in fact existed. On the other hand, if the court were to find that American Patriot is liable under Reinsurance Treaty 103 and related Program documents, Magistrate Judge Nolan would then stand ready to address the need for further discovery based on the fraud defense to this liability. In either event, the scope of the alleged fraud (and thus the scope of the exception to the attorney-client privilege) would depend upon the court's determination of the parties' liability. The court does not find this reasoning to be clearly erroneous.

Defendants next argue that Magistrate Judge Nolan's Order contradicts this court's finding "that the fraud defense should proceed through discovery." (Defs.' Mem. at 8). In August of 2005, this court issued an order declining to rule on the Liquidator's Motion to Strike Certain Affirmative Defenses, stating, "American Patriot need not plead all the facts associated with its affirmative defenses, and this court will not, at this time, make any factual determinations." (Dkt. No. 51 at 2). Since the time of the court's ruling, however, over a year's worth of discovery has taken place. Magistrate Judge Nolan has determined that the liability issue is now "ripe for summary judgment" based on the discovery that has proceeded thus far. This court has no reason to believe Magistrate Judge Nolan's finding was mistaken.

On a related issue, Defendants argue that "the Magistrate's procedural construct will have this Court deciding the meaning of the complex Program documents and Reinsurance Treaty without any discovery into the intent of the parties or the meaning of those documents." (Defs.' Mem. at 3). Defendants express concern that the district court would necessarily base its ruling on documents that have not been produced in their entirety, and which remain under the exclusive control of Legion and the Mutual entities, where they "could be retroactively amended at any time." (*Id.* at 16). The court finds that Magistrate Judge Nolan's Order effectively addresses Defendants' concerns. By the terms of Magistrate Judge Nolan's Order, if the district court were to find American Patriot liable, based on any and all evidence submitted to the court at that time, Defendants would be in a position to argue before Magistrate Judge Nolan that this alleged liability was only due to undiscovered evidence of fraudulent intent and behind-the-scenes manipulation of documentary evidence. Magistrate Judge Nolan could then determine whether there was a need for more discovery specific to the fraud defense. However, if the

Defendants next argue that Magistrate Judge Nolan's Order contradicts this court's finding "that the fraud defense should proceed through discovery." (Defs.' Mem. at 8). In August of 2005, this court issued an order declining to rule on the Liquidator's Motion to Strike Certain Affirmative Defenses, stating, "American Patriot need not plead all the facts associated with its affirmative defenses, and this court will not, at this time, make any factual determinations." (Dkt. No. 51 at 2). Since the time of the court's ruling, however, over a year's worth of discovery has taken place. Magistrate Judge Nolan has determined that the liability issue is now "ripe for summary judgment" based on the discovery that has proceeded thus far. This court has no reason to believe Magistrate Judge Nolan's finding was mistaken.

On a related issue, Defendants argue that "the Magistrate's procedural construct will have this Court deciding the meaning of the complex Program documents and Reinsurance Treaty without any discovery into the intent of the parties or the meaning of those documents." (Defs.' Mem. at 3). Defendants express concern that the district court would necessarily base its ruling on documents that have not been produced in their entirety, and which remain under the exclusive control of Legion and the Mutual entities, where they "could be retroactively amended at any time." (Id. at 16). The court finds that Magistrate Judge Nolan's Order effectively addresses Defendants' concerns. By the terms of Magistrate Judge Nolan's Order, if the district court were to find American Patriot liable, based on any and all evidence submitted to the court at that time, Defendants would be in a position to argue before Magistrate Judge Nolan that this alleged liability was only due to undiscovered evidence of fraudulent intent and behind-the-scenes manipulation of documentary evidence. Magistrate Judge Nolan could then determine whether there was a need for more discovery specific to the fraud defense. However, if the

Defendants next argue that Magistrate Judge Nolan's Order contradicts this court's finding "that the fraud defense should proceed through discovery." (Defs.' Mem. at 8). In August of 2005, this court issued an order declining to rule on the Liquidator's Motion to Strike Certain Affirmative Defenses, stating, "American Patriot need not plead all the facts associated with its affirmative defenses, and this court will not, at this time, make any factual determinations." (Dkt. No. 51 at 2). Since the time of the court's ruling, however, over a year's worth of discovery has taken place. Magistrate Judge Nolan has determined that the liability issue is now "ripe for summary judgment" based on the discovery that has proceeded thus far. This court has no reason to believe Magistrate Judge Nolan's finding was mistaken.

On a related issue, Defendants argue that "the Magistrate's procedural construct will have this Court deciding the meaning of the complex Program documents and Reinsurance Treaty without any discovery into the intent of the parties or the meaning of those documents." (Defs.' Mem. at 3). Defendants express concern that the district court would necessarily base its ruling on documents that have not been produced in their entirety, and which remain under the exclusive control of Legion and the Mutual entities, where they "could be retroactively amended at any time." (*Id.* at 16). The court finds that Magistrate Judge Nolan's Order effectively addresses Defendants' concerns. By the terms of Magistrate Judge Nolan's Order, if the district court were to find American Patriot liable, based on any and all evidence submitted to the court at that time, Defendants would be in a position to argue before Magistrate Judge Nolan that this alleged liability was only due to undiscovered evidence of fraudulent intent and behind-the-scenes manipulation of documentary evidence. Magistrate Judge Nolan could then determine whether there was a need for more discovery specific to the fraud defense. However, if the

Defendants next argue that Magistrate Judge Nolan's Order contradicts this court's finding "that the fraud defense should proceed through discovery." (Defs.' Mem. at 8). In August of 2005, this court issued an order declining to rule on the Liquidator's Motion to Strike Certain Affirmative Defenses, stating, "American Patriot need not plead all the facts associated with its affirmative defenses, and this court will not, at this time, make any factual determinations." (Dkt. No. 51 at 2). Since the time of the court's ruling, however, over a year's worth of discovery has taken place. Magistrate Judge Nolan has determined that the liability issue is now "ripe for summary judgment" based on the discovery that has proceeded thus far. This court has no reason to believe Magistrate Judge Nolan's finding was mistaken.

On a related issue, Defendants argue that "the Magistrate's procedural construct will have this Court deciding the meaning of the complex Program documents and Reinsurance Treaty without any discovery into the intent of the parties or the meaning of those documents." (Defs.' Mem. at 3). Defendants express concern that the district court would necessarily base its ruling on documents that have not been produced in their entirety, and which remain under the exclusive control of Legion and the Mutual entities, where they "could be retroactively amended at any time." (*Id.* at 16). The court finds that Magistrate Judge Nolan's Order effectively addresses Defendants' concerns. By the terms of Magistrate Judge Nolan's Order, if the district court were to find American Patriot liable, based on any and all evidence submitted to the court at that time, Defendants would be in a position to argue before Magistrate Judge Nolan that this alleged liability was only due to undiscovered evidence of fraudulent intent and behind-the-scenes manipulation of documentary evidence. Magistrate Judge Nolan could then determine whether there was a need for more discovery specific to the fraud defense. However, if the

Defendants next argue that Magistrate Judge Nolan's Order contradicts this court's finding "that the fraud defense should proceed through discovery." (Defs.' Mem. at 8). In August of 2005, this court issued an order declining to rule on the Liquidator's Motion to Strike Certain Affirmative Defenses, stating, "American Patriot need not plead all the facts associated with its affirmative defenses, and this court will not, at this time, make any factual determinations." (Dkt. No. 51 at 2). Since the time of the court's ruling, however, over a year's worth of discovery has taken place. Magistrate Judge Nolan has determined that the liability issue is now "ripe for summary judgment" based on the discovery that has proceeded thus far. This court has no reason to believe Magistrate Judge Nolan's finding was mistaken.

On a related issue, Defendants argue that "the Magistrate's procedural construct will have this Court deciding the meaning of the complex Program documents and Reinsurance Treaty without any discovery into the intent of the parties or the meaning of those documents." (Defs.' Mem. at 3). Defendants express concern that the district court would necessarily base its ruling on documents that have not been produced in their entirety, and which remain under the exclusive control of Legion and the Mutual entities, where they "could be retroactively amended at any time." (*Id.* at 16). The court finds that Magistrate Judge Nolan's Order effectively addresses Defendants' concerns. By the terms of Magistrate Judge Nolan's Order, if the district court were to find American Patriot liable, based on any and all evidence submitted to the court at that time, Defendants would be in a position to argue before Magistrate Judge Nolan that this alleged liability was only due to undiscovered evidence of fraudulent intent and behind-the-scenes manipulation of documentary evidence. Magistrate Judge Nolan could then determine whether there was a need for more discovery specific to the fraud defense. However, if the

district court were to find that American Patriot is not liable, there would be no need for further discovery into the question of whether Legion and the Mutual entities fraudulently amended the documents so as to create a non-existent liability. In either event, the court finds no prejudice to Defendants in bifurcating these issues.

Finally, Defendants argue that there is no vehicle through which the question of liability is likely to be brought before the district court. (Defs.' Mem. at 17-18). Defendants assert that "[c]ertainly Patriot would not be the moving party," and surmise that Magistrate Judge Nolan must have assumed that the Liquidator would move for summary judgment on the issue of liability. (*Id.* at 18). The court notes that Magistrate Judge Nolan's Order merely determined the timing of these two particular issues, finding that the issue of liability must be determined before arguments regarding the asserted privilege. One way to resolve these questions would be for one of the parties to bring a motion for summary judgment on the question of liability. If either party were so inclined, Magistrate Judge Nolan's Order describes the projected trajectory of such a motion. However, Magistrate Judge Nolan's Order does not preclude other avenues for resolving this case. At this point in time, for example, the Liquidator has filed a Motion for Summary Judgment on Defendants' Affirmative Defenses. (Dkt. No. 159). The court is not convinced that Magistrate Judge Nolan's Order will have the effect of bringing this case to a standstill.

CONCLUSION

For the reasons stated above, the court does not find Magistrate Judge Nolan's determination that the privilege question could be effectively bifurcated from other proceedings

district court were to find that American Patriot is not liable, there would be no need for further discovery into the question of whether Legion and the Mutual entities fraudulently amended the documents so as to create a non-existent liability. In either event, the court finds no prejudice to Defendants in bifurcating these issues.

Finally, Defendants argue that there is no vehicle through which the question of liability is likely to be brought before the district court. (Defs.' Mem. at 17-18). Defendants assert that "[c]ertainly Patriot would not be the moving party," and surmise that Magistrate Judge Nolan must have assumed that the Liquidator would move for summary judgment on the issue of liability. (*Id.* at 18). The court notes that Magistrate Judge Nolan's Order merely determined the timing of these two particular issues, finding that the issue of liability must be determined before arguments regarding the asserted privilege. One way to resolve these questions would be for one of the parties to bring a motion for summary judgment on the question of liability. If either party were so inclined, Magistrate Judge Nolan's Order describes the projected trajectory of such a motion. However, Magistrate Judge Nolan's Order does not preclude other avenues for resolving this case. At this point in time, for example, the Liquidator has filed a Motion for Summary Judgment on Defendants' Affirmative Defenses. (Dkt. No. 159). The court is not convinced that Magistrate Judge Nolan's Order will have the effect of bringing this case to a standstill.

CONCLUSION

For the reasons stated above, the court does not find Magistrate Judge Nolan's determination that the privilege question could be effectively bifurcated from other proceedings

district court were to find that American Patriot is not liable, there would be no need for further discovery into the question of whether Legion and the Mutual entities fraudulently amended the documents so as to create a non-existent liability. In either event, the court finds no prejudice to Defendants in bifurcating these issues.

Finally, Defendants argue that there is no vehicle through which the question of liability is likely to be brought before the district court. (Defs.' Mem. at 17-18). Defendants assert that "[c]ertainly Patriot would not be the moving party," and surmise that Magistrate Judge Nolan must have assumed that the Liquidator would move for summary judgment on the issue of liability. (*Id.* at 18). The court notes that Magistrate Judge Nolan's Order merely determined the timing of these two particular issues, finding that the issue of liability must be determined before arguments regarding the asserted privilege. One way to resolve these questions would be for one of the parties to bring a motion for summary judgment on the question of liability. If either party were so inclined, Magistrate Judge Nolan's Order describes the projected trajectory of such a motion. However, Magistrate Judge Nolan's Order does not preclude other avenues for resolving this case. At this point in time, for example, the Liquidator has filed a Motion for Summary Judgment on Defendants' Affirmative Defenses. (Dkt. No. 159). The court is not convinced that Magistrate Judge Nolan's Order will have the effect of bringing this case to a standstill.

CONCLUSION

For the reasons stated above, the court does not find Magistrate Judge Nolan's determination that the privilege question could be effectively bifurcated from other proceedings

district court were to find that American Patriot is not liable, there would be no need for further discovery into the question of whether Legion and the Mutual entities fraudulently amended the documents so as to create a non-existent liability. In either event, the court finds no prejudice to Defendants in bifurcating these issues.

Finally, Defendants argue that there is no vehicle through which the question of liability is likely to be brought before the district court. (Defs.' Mem. at 17-18). Defendants assert that "[c]ertainly Patriot would not be the moving party," and surmise that Magistrate Judge Nolan must have assumed that the Liquidator would move for summary judgment on the issue of liability. (*Id.* at 18). The court notes that Magistrate Judge Nolan's Order merely determined the timing of these two particular issues, finding that the issue of liability must be determined before arguments regarding the asserted privilege. One way to resolve these questions would be for one of the parties to bring a motion for summary judgment on the question of liability. If either party were so inclined, Magistrate Judge Nolan's Order describes the projected trajectory of such a motion. However, Magistrate Judge Nolan's Order does not preclude other avenues for resolving this case. At this point in time, for example, the Liquidator has filed a Motion for Summary Judgment on Defendants' Affirmative Defenses. (Dkt. No. 159). The court is not convinced that Magistrate Judge Nolan's Order will have the effect of bringing this case to a standstill.

CONCLUSION

For the reasons stated above, the court does not find Magistrate Judge Nolan's determination that the privilege question could be effectively bifurcated from other proceedings

district court were to find that American Patriot is not liable, there would be no need for further discovery into the question of whether Legion and the Mutual entities fraudulently amended the documents so as to create a non-existent liability. In either event, the court finds no prejudice to Defendants in bifurcating these issues.

Finally, Defendants argue that there is no vehicle through which the question of liability is likely to be brought before the district court. (Defs.' Mem. at 17-18). Defendants assert that "[c]ertainly Patriot would not be the moving party," and surmise that Magistrate Judge Nolan must have assumed that the Liquidator would move for summary judgment on the issue of liability. (*Id.* at 18). The court notes that Magistrate Judge Nolan's Order merely determined the timing of these two particular issues, finding that the issue of liability must be determined before arguments regarding the asserted privilege. One way to resolve these questions would be for one of the parties to bring a motion for summary judgment on the question of liability. If either party were so inclined, Magistrate Judge Nolan's Order describes the projected trajectory of such a motion. However, Magistrate Judge Nolan's Order does not preclude other avenues for resolving this case. At this point in time, for example, the Liquidator has filed a Motion for Summary Judgment on Defendants' Affirmative Defenses. (Dkt. No. 159). The court is not convinced that Magistrate Judge Nolan's Order will have the effect of bringing this case to a standstill.


CONCLUSION

For the reasons stated above, the court does not find Magistrate Judge Nolan's determination that the privilege question could be effectively bifurcated from other proceedings

in this case to have been made in error. The court overrules Defendants' Objections and affirms Magistrate Judge Nolan's May 9, 2006 Order.

ENTER:

_James F. Holderman_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: December 4, 2006

in this case to have been made in error.  The court overrules Defendants' Objections and affirms

Magistrate Judge Nolan's May 9, 2006 Order.


ENTER:


_James F. Holderman_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court


Date:   December 4, 2006

in this case to have been made in error.  The court overrules Defendants' Objections and affirms Magistrate Judge Nolan's May 9, 2006 Order.

ENTER:

_James F. Holderman_

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date:   December 4, 2006

in this case to have been made in error. The court overrules Defendants' Objections and affirms

Magistrate Judge Nolan's May 9, 2006 Order.


ENTER:

_James F. Holderman_
JAMES F. HOLDERMAN
Chief Judge, United States District Court


Date: December 4, 2006

in this case to have been made in error.  The court overrules Defendants' Objections and affirms

Magistrate Judge Nolan's May 9, 2006 Order.


ENTER:


_James F. Holderman_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court


Date:   December 4, 2006