IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOEL ARIO,[1] Acting Insurance Commissioner for the Commonwealth of Pennsylvania, acting in his official capacity as Statutory Liquidator of Legion Insurance Company and Villanova Insurance Company, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 05 C 1049 |
| AMERICAN PATRIOT INSURANCE AGENCY, INC., a Wisconsin corporation, and LYSA JO SARAN, an individual, | ) ) ) ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On August 22, 2005, in the early stages of this litigation, this court denied Plaintiff's

Motion to Strike Certain Affirmative Defenses (Dkt. No. 17), in part because the parties had not

had an adequate opportunity to develop the evidentiary record. (*See* 8/22/05 Order, Dkt. No. 51

at 2). Now pending before the court, after a substantial period for discovery, is Plaintiff's

Motion for Summary Judgment on Defendants' Affirmative Defenses. (Dkt. No. 159). For the

reasons set forth in detail below, Plaintiff's Motion for Summary Judgment is granted in part and

[1] Plaintiff's Motion for Summary Judgment on Defendants' Affirmative Defenses (Dkt. No. 159) was originally filed by then Insurance Commissioner M. Diane Koken. On August 16, 2007, this court granted Plaintiff's Motion to Substitute M. Diane Koken's Successor as a Party and to Amend the Case Caption Accordingly, (Dkt. No. 231), substituting Acting Insurance Commissioner Joel Ario as plaintiff.

1

denied in part. Summary judgment is granted in favor of the Plaintiff on Defendants' Fourth Affirmative Defense (Offset) and Ninth Affirmative Defense (Rescission). Summary Judgment is denied on Defendants' Second Affirmative Defense (Unclean Hands), Seventh Affirmative Defense (Estoppel - Fraud), Eighth Affirmative Defense (Estoppel - Negligent Misrepresentation), and Tenth Affirmative Defense (Estoppel - 2000 Program Year), as well as Defendants' Third Affirmative Defense (Failure to Comply with Contractual Obligations).

## BACKGROUND

Plaintiff Joel Ario, Acting Insurance Commissioner for the Commonwealth of Pennsylvania, brings this lawsuit in his official capacity as the Statutory Liquidator ("Liquidator") for Legion Insurance Company and Villanova Insurance Company (collectively "Legion") to recover premiums allegedly owed by defendant American Patriot Insurance Agency, Inc. ("American Patriot")[2] under a Limited Agency Agreement in effect from 1997 to 2001. *See generally* Article V of the Pennsylvania Insurance Department Act of 1921, 40 Pa. Stat. §§ 221.1-221.63.

Under the Limited Agency Agreement, American Patriot sold Legion workers' compensation insurance policies and collected premiums on Legion's behalf in exchange for a commission based on a percentage of the premiums collected. The Limited Agency Agreement was part of the Roofers' Advantage Program (the "Program") offered through Legion and its affiliates. In addition to the Limited Agency Agreement, the Program consisted of a number of different contracts between various affiliated companies and individuals.

---

[2] Defendant Lysa Saran ("Saran") is President of American Patriot and functions as its designated compliance officer. The only claims asserted against Saran are for money that is allegedly owed by American Patriot to Legion.

For example, the Third Party Administrator Agreement was a contract between Legion and Cunningham-Lindsey Claims Management, Inc. ("Cunningham-Lindsey"), under which Cunningham-Lindsey handled and paid claims on behalf of Legion. Another company, Mutual Indemnity (Bermuda), Ltd. ("Mutual Indemnity"), acted as reinsurer of the Program. The relationship between Legion and Mutual Indemnity was governed by a contract known as the Reinsurance Treaty. Additionally, as part of the initial set-up of the Program in 1997, a Shareholder Agreement was signed between Mutual Holdings (Bermuda), Ltd. ("Mutual Holdings") and the "shareholder" party.[3] Pursuant to the Shareholder Agreement, the shareholder was obligated to indemnify Mutual Indemnity for certain losses on the Program, but the shareholder also obtained a right to certain underwriting dividends if the Program was profitable. An April 20, 2000 Letter Agreement (also known as the Aggregate Stop Loss Buyout Agreement) allegedly capped the shareholder's liability under the Shareholder Agreement. Marketing services for the Program were provided by Commonwealth Risk Services, L.P. ("Commonwealth Risk"), which provided American Patriot with a Program Proposal for each upcoming Program year. Finally, Mutual Risk Management, Ltd. ("Mutual Risk") was the parent company of Commonwealth Risk, Legion Insurance Company, Villanova Insurance Company, and Mutual Indemnity.

---

[3] The identity of the shareholder party is a disputed issue in this case. While American Patriot originally was a party to the Shareholder Agreement with Mutual Holdings in 1997, the Shareholder Agreement was amended in 1998 to retroactively substitute two individuals, Diane and Kenneth Hendricks ("the Hendricks"), for American Patriot as shareholder. An analysis of the provisions and resultant obligations of the Shareholder Agreement is included later in this opinion.

In their respective Answers, defendants Lysa Saran ("Saran") and American Patriot (collectively "Defendants") have set forth numerous affirmative defenses that they allege preclude enforcement of the Limited Agency Agreement. (*See* Dkt. No. 10, Dkt. No. 54). In Plaintiff's Motion for Summary Judgment currently before the court, the Liquidator asserts that seven of these affirmative defenses [4] "cannot be legally valid defenses in this action regardless of any other facts or disputes in this case." (Dkt. No. 161 at 4).

<u>LEGAL STANDARD</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, the court must view all evidence in the light most favorable to the non-moving party. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The court does not make credibility determinations or weigh conflicting evidence. *Abdullahi*, 423 F.3d at 773. However, summary judgment must be granted in favor of the moving party if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

---

[4] The affirmative defenses at issue include "unclean hands" (Second Affirmative Defense); "failure to comply with contractual obligations" (Third Affirmative Defense); "offset" (Fourth Affirmative Defense); "estoppel – fraud" (Seventh Affirmative Defense); "estoppel – negligent misrepresentation" (Eighth Affirmative Defense); "rescission" (Ninth Affirmative Defense); and "estoppel – 2000 program year" (Tenth Affirmative Defense).

4

P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).[5]

<u>CHOICE OF LAW</u>

The court's subject matter jurisdiction over this lawsuit is based upon the diversity of the parties' citizenship and the amount in controversy under 28 U.S.C. § 1332. The Liquidator's claims are all based upon state law. Generally, where the parties have not identified a conflict of law affecting the issues of the case, a court sitting in diversity will apply the substantive law of the forum state. *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 671 (7th Cir. 2004). In this case, while the parties disagree whether Illinois or Pennsylvania law governs certain issues, the parties have not identified any conflict of law that is relevant to the court's final analysis of the Liquidator's Motion for Summary Judgment. The court therefore applies Illinois law in the analysis that follows.

When applying state law, a federal court "must apply the law of the state as it believes the highest court of the state would apply it if the issue were presently before that tribunal." *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)). If "the highest court in the state has not spoken" on a question of law, the federal court looks to decisions of the intermediate appellate courts in that state for

---

[5] Local Rule 56.1 governs the procedures to be followed by the parties in briefing, submitting and responding to motions for summary judgment in the Northern District of Illinois. Defendants argue that "the Liquidator's Rule 56.1 statement is so deficient that this Court should either deny the Liquidator's motion for summary judgment due to [his] failure to make a proper Rule 56.1 submission or strike the Liquidator's Rule 56.1 statement itself." (Dkt. No. 190 at 5, n.3). Because the court finds that Defendants were not prejudiced in their ability to respond effectively to the Liquidator's 56.1 Statement of Material Facts, the court denies the requested relief. *See Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (recognizing the district court's discretion to require compliance with the local rules governing summary judgment).

persuasive guidance in predicting how the state's highest court would decide a question of law. *Abstract & Title Guar. Co., Inc. v. Chicago Ins. Co.*, 489 F.3d 808, 811 (7th Cir. 2007).

<u>ANALYSIS</u>

For the most part, the Liquidator's argument in support of his Motion for Summary Judgment on Defendants' Affirmative Defenses centers on the question of whether Defendants are entitled to the remedies Defendants have alleged. The Liquidator contends that the answer to this question must be "No," arguing that rescission of the contract is impossible and set-off is barred. Furthermore, "[b]ecause the damages, rights and claims on which defendants' affirmative defenses are based belong solely to the nonparty Hendricks and not to American Patriot, as a matter of law, they cannot be legally valid defenses in this action regardless of any other facts or disputes in this case." (Dkt. No. 161-2 at 3-4). In other words, it is the Liquidator's position that "even if [Defendants] could prove the fraud which they allege," Defendants cannot satisfy the legal requirements of the affirmative defenses they have plead. (Dkt. No. 161-2 at 8).

On the other hand, Defendants argue that their affirmative defenses go to the validity of the contract and the fairness of enforcing the Limited Agency Agreement against them. Defendants note that they are "not seek[ing] to recover damages in connection with [their] affirmative defenses." (Dkt. No. 214 at 7). Instead, Defendants' goal is "to bar the Liquidator from seeking recovery against it under the Limited Agency Agreement." (*Id.*). Defendants ask the court to avoid "an overly restrictive view" of its own equitable powers, and to grant Defendants relief through rescission of the contract, setoff against debts owed to the Liquidator, or any other equitable relief such that "regardless of the legal label used . . . the Liquidator may

not enforce the contract against Defendants." (Dkt. No. 190 at 17, 19).

1.    Fraud Defenses

As discussed above, the question before the court is whether the undisputed facts support the Liquidator's position as a matter of law. For purposes of this motion only, the Liquidator has chosen not to dispute Defendants' allegations of fraud. Therefore, the court begins its analysis with a description of Defendants' allegations, as set forth in their affirmative defenses, having accepted as true the fraud alleged by Defendants.

A.    The Fraudulent and Negligent Misrepresentations

Three of the affirmative defenses set forth by Defendants (unclean hands, estoppel – fraud, and estoppel – 2000 program year) seek direct equitable relief due to fraudulent misrepresentations made by Legion Insurance Company, Villanova Insurance Company, Mutual Risk, Commonwealth Risk, and Mutual Indemnity (collectively, the "Mutual Entities") while marketing and operating the Roofers' Advantage Program. In the alternative, Defendants also contend that the Mutual Entities' misrepresentations were negligently made.[6]

Specifically, on or about February, 2000, Eric Bossard ("Bossard") (a Legion Vice President) and James Agnew ("Agnew") (a Commonwealth Risk Vice President) made materially false statements to shareholder Diane Hendricks and American Patriot President Lysa Saran for purposes of inducing them to agree to the Year 4 renewal of the Program. Knowing the Program was in serious financial trouble, Bossard and Agnew reassured Diane Hendricks and Lysa Saran that the Program was stable and that any under-reserving troubles with Cunningham-

_____

[6] For purposes of simplicity, Defendants' second, seventh, eighth and tenth affirmative defenses are collectively referred to in this opinion as the "fraud defenses."

Lindsey had been "resolved." At the same meeting, Agnew falsely indicated that he did not know the extent of the Hendricks' exposure under the Shareholder Agreement.

In a subsequent phone call, after consulting with representatives of the other Mutual Entities, Bossard and Agnew falsely stated that the Shareholder Agreement made Diane and Kenneth Hendricks liable for losses up to Legion's policy limits, knowing this was not true. Bossard and Agnew then convinced the Hendricks that they could cap their (non-existent) liability with respect to the first three years of the Program by purchasing $1 million of (phantom) reinsurance through Mutual Indemnity. David Alexander, the President of Mutual Indemnity, prepared and sent a letter to Lysa Saran on April 20, 2000, falsely memorializing Mutual Indemnity's intent to purchase reinsurance to cover the Hendricks' (non-existent) liability. In reliance on the misrepresentations of Bossard, Agnew, and Alexander, the Hendricks paid $1 million to Mutual Indemnity for purchase of the promised reinsurance. This extra $1 million allowed the Mutual Entities to continue the Program without significantly raising costs, while at the same time the Mutual Entities also amended the Program documents for Year 4 so as to actually expand the Hendricks' liability up to the policy limits. Both American Patriot and the Hendricks relied upon the truth of these false representations in renewing the Program for Year 4. B.        The Parties' Arguments on Summary Judgment

The problem with Defendants' fraud defenses, according to the Liquidator, is that American Patriot cannot prove that it suffered any harm that was proximately caused by the fraud. The Liquidator notes that the Hendricks, as parties to the Shareholder Agreement, purchasers of $1 million of (phantom) reinsurance, and suppliers of letters of credit securing their obligation to Mutual Indemnity, were significantly more likely to have suffered losses due

to the fraudulent activities than were American Patriot and Saran.  The Liquidator asserts that Defendants cannot prove they suffered any damages at all and, without damages, cannot support their requests for relief.

Defendants consider the Liquidator's argument "illogical."  (Dkt. No. 214 at 2) ("The Liquidator continues to assert [his] illogical argument that a defendant may only raise fraud as a contract defense if the defendant has suffered a harm separate and distinct from the obvious harm that will occur if the plaintiff, who is the perpetrator of the fraud, is permitted to enforce the fraudulently induced contract.").  Defendants argue that, due to the fraud on the part of the Mutual Entities, Defendants are entitled to equitable relief from the court in the form of non-enforcement of the Limited Agency Agreement.  In the alternative, Defendants argue that they have suffered damages under the Shareholder Agreement.

C.    Effect of the Fraud on the Enforceability of the Limited Agency Agreement

Under Article V of the Insurance Department Act of 1921, the Statutory Liquidator is authorized "[t]o collect all debts and moneys due and claims belonging to the insurer which it is economical to collect, wherever located, and for this purpose to institute timely action in other jurisdictions."  Section 523, 40 Pa. Stat. § 221.23(6).  When operating in this capacity, the Liquidator stands in the shoes of the insolvent company.  *Koken v. One Beacon Ins. Co.*, 911 A.2d 1021, 1029 (Pa. Commw. Ct. 2006).  "[T]he Statutory Liquidator has no greater rights under [a] contract than the insurer and would be subject to any defenses that may be asserted against the insurer by the other party to the contract."  *Kaiser v. Monitrend Inv. Mgmt., Inc.*, 672 A.2d 359, 364 n.5 (Pa. Commw. Ct. 1996).

Under both Illinois and Pennsylvania law, policymakers have limited parties' rights to bring actions at law or in equity against insolvent insurers. *See* 215 Ill. Comp. Stat. 5/189; 40 Pa. Stat. § 221.26(a). This is because allowing such actions "would create a preference over the other creditors standing in line in the liquidation proceeding." *Koken v. Research Underwriters, LLC*, No. 70 M.D.2004, 2005 WL 473576, at * 2 (Pa. Commw. Ct. 2005). At the same time, however, contractual defenses are permitted to the extent they would be permitted against the insolvent company itself. *See Koken v. Legion Insurance Company*, 900 A.2d 418, 425 (Pa. Commw. Ct. 2006) (Pennsylvania insolvency law bars "counterclaims but not affirmative defenses"); *In re Liquidation of Inter-American Ins. Co. of Ill.*, 707 N.E.2d 617, 621 (Ill. App. Ct. 1999) (noting "[i]t is not uncommon for a defendant to have more than one ground upon which it may avoid liability," where defendant reinsurer argued for non-enforcement of a contract on the grounds that it was executory in nature).

Under general contract principles, it is well established that a contract procured by fraud is voidable by the innocent party. As articulated in the Restatement (Second) of Contracts, "If a party's manifestation of assent is induced by a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement (Second) of Contracts § 164(1) (1981). Illinois subscribes to this approach. *See Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 864 N.E.2d 927, 939 (Ill. App. Ct. 2007) ("the perpetrator of the fraud cannot enforce a voidable contract") (citing *Ill. State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 821 N.E.2d 706, 712-13 (Ill. App. Ct. 2004)); *see also Wilkinson v. Appleton*, 190 N.E.2d 727, 729-30 (Ill. 1963).

In this case, Defendants argue that they would not have signed-up for Year 4 of the Program were it not for the misrepresentations of Agnew and Bossard. (Dkt. No. 190 at 13). The Liquidator does not dispute Defendants' assertion; however, the Liquidator does argue that Defendants cannot assert fraud as a defense to the enforcement of any Program documents executed prior to 2000, *i.e.* from 1997-1999. (Dkt. No. 201-2 at 3). Accepting as true, for purposes of this motion, that the fraud occurred in 2000 as alleged by Defendants, the court finds that any Program documents executed in Year 4 as a result of the fraud, under which Defendants could be found liable, are voidable at the election of Defendants. In the case of a voidable contract, the innocent party has the option of either (1) rescinding the fraudulently-induced contract, or (2) affirming the contract despite the fraud and suing for damages. *See, e.g., Coregis*, 821 N.E.2d at 713; *City of Chicago v. Michigan Beach Housing Co-op.*, 696 N.E.2d 804, 809 (Ill. App. Ct. 1998); *Estes v. Smith*, 614 N.E.2d 469, 473 (Ill. App. Ct. 1993). The court discusses each option separately below.

D.  <u>Damages Proximately Caused by the Fraud</u>

One of Defendants' options is to affirm the fraudulently-induced contract and sue for damages. In other words, Defendants would still be obligated to perform pursuant to the relevant contract, but could collect for any damages incurred as a result of the fraud. *See City of Chicago*, 696 N.E.2d at 811. On the other hand, "proximate causation limits recovery to 'those damages which might foreseeably be expected to follow from the character of the misrepresentation itself.'" *Id.* (quoting *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 748 (Ill. 1994)). In this case, the Liquidator argues that Defendants are not entitled to any

damages because they were not harmed as a result of the fraud.[7]  Defendants, on the other hand, argue that their damages exist in the form of potential liability under both the Limited Agency Agreement and the Shareholder Agreement.[8]

The court does not agree with Defendants that their potential liability under the Limited Agency Agreement constitutes damages proximately caused by the fraudulent misrepresentations of the Mutual Entities.  When a contract has been induced by fraud, the innocent party has a choice of whether to rescind the contract or affirm it.  In this case, if the court were to enforce the Limited Agency Agreement against Defendants, despite the fraudulent misrepresentations made by representatives of the Mutual Entities, the court would only do so if it found that Defendants had chosen not to rescind the Limited Agency Agreement at the time that they became aware of the fraud.  In other words, enforcement would be the result of Defendants' intervening election to affirm the contract and accept its benefits, and not a direct result of the fraud.  Enforcement of the terms of the Limited Agency Agreement therefore cannot equate to damages proximately caused by fraud.  Because Defendants have set forth no evidence or argument that the fraud otherwise affected their rights and obligations under the Limited Agency Agreement, the court finds that under the undisputed material facts the Defendants have not suffered any damages under the Limited Agency Agreement due to the fraudulent misrepresentations of the Mutual Entities.

---

[7] The Liquidator also argues that Defendants must prove damages proximately caused by the Mutual Entities' material misrepresentations in order to prevail on the other "fraud defenses" — equitable estoppel and negligent misrepresentation.

[8] The court refers to these contracts in their entirety for the sake of simplicity, but notes that relevant damages can only be attributed to liability based on renewal in Year 4 of the Program.

However, Defendants also argue that they have suffered damages due to their potential liability pursuant to the terms of the Shareholder Agreement.[9]  The Liquidator admits that "[t]he losses and harm which form the bases of [the fraud defenses]" include "losses under the Shareholder Agreement."  (Dkt. No. 161-2 at 8).  But the Liquidator further argues that American Patriot is not liable under the Shareholder Agreement, because Amendment Number 1 to the Shareholder Agreement, executed in 1998, retroactively substituted Diane and Kenneth Hendricks for American Patriot as shareholder.  (*See* Plaintiff's Statement of Material Facts in Support of Motion for Summary Judgment on Defendants' Affirmative Defenses ("SMF"), Ex. K).

The question of American Patriot's liability pursuant to the Shareholder Agreement is currently the subject matter of a lawsuit pending in the Supreme Court of Bermuda (Case 2003 No. 26; "the Bermuda lawsuit").  *See also Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884 (2004) (recognizing that the Shareholder Agreement's forum-selection clause states that "any dispute concerning this Agreement shall be resolved exclusively by the courts of Bermuda").  In the Bermuda lawsuit, Mutual Holdings has filed claims against both American Patriot and the Hendricks alleging that Mutual Holdings is entitled to indemnification pursuant to the Shareholder Agreement.  (Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Material Facts in Support of Motion for Summary Judgment on Certain Defendants' Affirmative Defenses ("Response"), Ex. 8, Ex. 21).

In the case before this court, both the Liquidator and Defendants have directed the court's attention to various opinion testimony regarding whether American Patriot remains liable

---

[9] See Section 2, *infra*, for an analysis of the interrelatedness of all Program documents.

pursuant to the Shareholder Agreement, despite the 1998 Amendment. (*E.g.,* Response Ex. 10 (Diane Hendricks Aff.) at 3-4 n.1; Response Ex. 7 (Alexander Aff.) ¶ 19; Response Ex. 8 (Skeleton Argument of Bermuda Plaintiffs) ¶¶ 31-32; Response Ex. 12 (Agnew Aff.) ¶ 6).[10] However, because the question of American Patriot's liability pursuant to the Shareholder Agreement remains unresolved and pending before the Supreme Court of Bermuda, this court, on further consideration, believes that there is an open question of material fact as to whether American Patriot has been exposed to increased liability under the Shareholder Agreement. The court further notes that the other parties to the Shareholder Agreement (Diane Hendricks, Kenneth Hendricks and Mutual Holdings), who are litigating in Bermuda, are not before this court. A determination of respective liabilities may be improper without the participation of all parties to the contract. In the event the Supreme Court of Bermuda determines that American Patriot is liable for losses incurred pursuant to the Shareholder Agreement, this court will then be in a position to evaluate the effect of the Bermuda court's determination and whether any losses can be proximately attributed to the fraudulently-induced renewal of the Shareholder Agreement in Year 4 of the Program.

Because a disputed question of material fact exists regarding whether American Patriot has suffered damages under the Shareholder Agreement proximately caused by the Mutual Entities' fraud, the Liquidator's Motion for Summary Judgment on Defendants' fraud defenses is

---

[10] In its Answer, American Patriot recognizes that its liability under the Shareholder Agreement remains an open question. (*See* Dkt. No. 10, Seventh Affirmative Defense ¶¶ 3, 29). Although American Patriot asserts in its Answer that it is *not* liable pursuant to the Shareholder Agreement, this assertion does not preclude the argument that American Patriot will suffer damages if the Supreme Court of Bermuda holds American Patriot liable under the Shareholder Agreement.

denied.

E.      Rescission

In their Answers, Defendants plead rescission as a separate affirmative defense, arguing

that "[b]y virtue of the fraudulent acts described in paragraphs 1 through 30 of the Seventh

Affirmative Defense above, the Limited Agency Agreement . . . must be canceled, vacated, or

annulled, and the parties restored to the *status quo ante*."  (*See* Ninth Affirmative Defense; Dkt.

No. 10 at 22; Dkt. No. 54 at 20).  As discussed in the court's analysis above, an innocent party

generally has a right to rescind a fraudulently-induced contract.  On the other hand, if this right is

not exercised promptly, it can be waived.  *See Coregis*, 821 N.E.2d at 713-14 ("An unreasonable

delay in taking the necessary steps to set aside a fraudulent contract will have the effect of

affirming it."); *see also City of Chicago*, 696 N.E.2d at 811 ("If a defrauded party does not

'disaffirm or abandon the transaction with all reasonable diligence' and 'conducts himself . . . as

though [the contract were] still subsisting and binding,' he waives his right to rescind and must

continue to perform his obligations under the contract.") (quoting *Eisenberg v. Goldstein*, 195

N.E.2d 184, 187 (Ill. 1963)).

In his Motion for Summary Judgment on Defendants' Affirmative Defenses, the

Liquidator contends that Defendants failed to act promptly to rescind the Limited Agency

Agreement.  The Liquidator notes that Defendants knew of the fraud as early as April, 2002

(when American Patriot filed case number 02 C 2728 in the Northern District of Illinois, alleging

fraud against Mutual Risk) (discussed in Section 2, *infra*), but that Defendants evidenced no

intent to rescind the Limited Agency Agreement until filing their respective Answers to this

lawsuit in 2005.  The Liquidator also points out that Defendants have not taken any steps to

restore the *status quo ante* of the parties, such as tendering the commissions earned by American Patriot pursuant to the fraudulently-induced Limited Agency Agreement. Defendants argue that, by the time they discovered the fraud in the spring of 2002, it was too late to terminate the Limited Agency Agreement, as American Patriot was no longer participating in the Program and "there was no existing contract to disaffirm." (Dkt. No. 190 at 21).

The problem with Defendants' argument is that it equates rescission with termination of a contract. The goal of rescission is to return the parties to their *status quo ante*. *Martin*, 643 N.E.2d at 746. Termination, on the other hand, is a form of prospective relief affecting the future rights and obligations of the parties toward each other. *See Roberts v. Sears, Roebuck & Co.*, 617 F.2d 460, 464 (7th Cir. 1980) (recognizing that, where court returned patent to the plaintiff "to insure that he would realize any future benefits," such remedy was best viewed as "cancellation, termination or forfeiture" of the prior agreement, rather than rescission). In this case, termination of the Limited Agency Agreement may very well have been inappropriate, due to a lack of future rights and obligations between the parties. However, rescission does not require this type of prospective relief.

If, in 2002, Defendants had desired to rescind the Limited Agency Agreement on the basis of its fraudulent inducement, they could have taken steps to seek restoration of the *status quo ante* at that time. At the very least, Defendants could have notified Legion (or the Liquidator) of their intent to rescind the contract. Affirmative steps towards implementing the desired rescission would also have included tendering to Legion (or the Liquidator) any commissions that American Patriot had already earned pursuant to the fraudulently-induced contract. *See Lempa v. Finkel*, 663 N.E.2d 158, 165 (Ill. App. Ct. 1996) ("Restoring the parties

16

to the *status quo ante* requires each party to return to the other the value of the benefits received under the rescinded contract.").

Defendants, however, did not notify Legion or the Liquidator of their intent to rescind the Limited Agency Agreement until filing their Answers in 2005. Additionally, as of the writing of this opinion, Defendants have yet to tender the commissions earned under the fraudulently-induced Limited Agency Agreement. Under Illinois law, "[i]t is a general rule, to which there are but few exceptions, that the restoration of the party against whom the relief is sought, or the offer to restore him, to the position which he occupied before the transaction complained of took place, is a condition precedent to the right to rescind." *Martin*, 643 N.E.2d at 746. Furthermore, "a party attempting to declare a rescission of the contract, who afterwards exercises acts of ownership over the subject matter of the contract, treating it as his own, will be held to have waived his right to rescind." *O'Donnell & Duer Bavarian Brewing Co. v. Farrar*, 45 N.E. 283, 285 (Ill. 1896). In this case, the court finds Defendants' failure to take any steps towards rescinding the Limited Agency Agreement until three years after they acquired knowledge of the fraud, coupled with Defendants' continued retention of the benefits of the contract, to be dispositive evidence that Defendants have waived their right to rescind the Limited Agency Agreement. The Liquidator's Motion to Strike Defendants' Ninth Affirmative Defense is therefore granted.

2.    Breach of Contract

Defendants' Third Affirmative Defense alleges a claim for breach of contract, stating that Legion failed "to adhere to the terms and conditions of the Limited Agency Agreement, including but not limited to numerous errors and omissions in connection with the underwriting

and claims handling process for the Roofers' Advantage Insurance Program."  (Dkt. No. 10 at 13; Dkt .No. 54 at 11).  To recover for a breach of contract claim under Illinois law, a claimant must establish (1) the existence of a valid and enforceable contract; (2) substantial performance by the claimant; (3)  breach of the contractual duties by the opposing party; and (4) resultant damages.  *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)).

In this case, the Liquidator first argues that the Limited Agency Agreement does not set forth any underwriting or claims-handling duties owed by Legion to American Patriot.  In other words, if there is no contractual duty, there can be no claim for breach of contract.  Viewing the facts in the light most favorable to the non-moving party, as the court must do when ruling on a motion for summary judgment, the court rejects this argument.  The court finds that there is sufficient evidence in the record to support Defendants' position that Legion may have owed such duties to American Patriot pursuant to the "package" of contracts that together formed the Roofers' Advantage Program.  *See Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 889 (7th Cir. 2004) ("*American Patriot II*").

In *American Patriot II*, the plaintiffs (American Patriot, Diane Hendricks, and Kenneth Hendricks) appealed from the district court's order dismissing their case against Mutual Risk, Mutual Indemnity, Commonwealth Risk, and Cunningham-Lindsey[11] on the basis of a forum-

---

[11] Other defendants included Richard Turner (President of Commonwealth Risk), Glenn Partridge (Executive Vice President of Legion), and  David Alexander (President of Mutual Indemnity).

selection clause in the Shareholder Agreement.[12]  *Id.* at 886; *see also*, *Am. Patriot Ins. Agency v. Mut. Risk Mgmt., Ltd.*, 248 F. Supp. 2d 779, 781 (N.D. Ill. 2003) ("*American Patriot I*").  In affirming the dismissal of the case against all defendants other than Cunningham-Lindsey, the Seventh Circuit held that the Mutual defendants "all worked together to create and administer" the Program.  *American Patriot II* at 889.  The Seventh Circuit also held that the forum-selection clause applied to all Program documents, recognizing that "[t]he contracts, including the Shareholder Agreement, are a package."[13]  *Id.*  At the same time, however, the Seventh Circuit also considered "the anomalous status of Cunningham-Lindsey," determining that "Cunningham-Lindsey is not affiliated with the Mutual defendants and cannot be thought a party to the forum-selection clause."  *Id.* at 888.  The Third Party Administrator Agreement between Legion and Cunningham-Lindsey was therefore not considered part of the Program documents.

In addition to citing *American Patriot II*, Defendants also direct this court to the May 1, 2000 Program Proposal in support of their argument that the Program contracts should be viewed as a "package."  The May 1, 2000 Program Proposal states that American Patriot "must execute the following agreements, drafts of which are enclosed: Shareholder Agreement, Management Agreement, Claims Servicing Agreement and other documentation as may be required."  (Ans., Ex. F at 4).  Furthermore, Eric Bossard ("Bossard"), former Legion Vice President, attested that

---

[12] In the *American Patriot I* case before the district court, American Patriot and the Hendricks had alleged claims of fraud, misrepresentation, conspiracy, breach of contract, equitable relief, RICO violations and negligence arising out of the failed Roofers' Advantage Program.  *American Patriot I* at 781.

[13] The court notes that neither the Liquidator nor Defendants argue for a change of venue in the case now pending before this court.  This is just as well, as any argument based on the forum-selection clause of the Shareholder Agreement would be considered waived at this late stage of the proceedings.

various contracts were "necessary to implement the Program," and that these contracts "were standard, form agreements whose terms were non-negotiable." (Response, Ex. 3 (Bossard Aff.) ¶ 6). Based the evidentiary record before this court, as well as the Seventh Circuit's holding in *American Patriot II*, the court finds that Legion's duties to American Patriot were not restricted to the Limited Agency Agreement. This court therefore views the Program documents as a whole in assessing whether Legion may have owed American Patriot any underwriting or claim-handling duties pursuant to the terms of the Program.

Turning to the other Program documents, it is apparent that at least some of the yearly Program Proposals specifically note Legion's commitment to annually underwrite the Program along with American Patriot. (*See*, *e.g.*, Ans., Ex. D at 5 (Feb 17, 1998 Proposal) ("Legion Insurance Company and American Patriot Insurance Agency will annually underwrite the group as a whole"); Ans., Ex. E at 5 (Mar. 11, 1999 Proposal) ("Villanova and American Patriot Insurance Agency will annually underwrite the group as a whole")). In their deposition testimony, both Bossard[14] and Lysa Saran ("Saran"), President of American Patriot, support Defendants' contention that Legion performed underwriting duties pursuant to the terms of the Program. (Response, Ex. 4 (Saran Dep.) at 66; Dkt. No. 168 (Bossard Dep.) (filed under seal)). In fact, in a previous affidavit signed on April 9, 2002, Bossard attested that "Legion retained total control over the underwriting process for the Program, including the authority to set the premiums to be charged." (Resp., Ex. 3 ¶ 7).

---

[14] The deposition testimony of Eric Bossard (November 24, 2003) was filed under seal in this record, but is available to counsel and the court.

Additionally, the March 24, 1997 Program Proposal specifically states that "this proposal *does* include claims handling services." (Ans., Ex. A at 6) (emphasis added). The May 1, 2000 Program Proposal states that "Claims are to be adjusted by Cunningham-Lindsey in accordance with the guidelines and requirements of Legion/Villanova. . . . The ultimate claims handling authority is to be retained by Legion/Villanova." (Ans., Ex. F. at 3).

Because Defendants have produced evidence that Legion may have owed both claims handling and underwriting duties to American Patriot under the Program documents, the court rejects the Liquidator's contention that the undisputed evidence shows that no such contractual duties existed.

The Liquidator's second argument is that Defendants cannot prove that Legion breached any underwriting duties, even if such duties did exist. The Liquidator bases this argument on the fact that Defendants did not identify any expert witnesses or disclose any expert reports showing that Legion's underwriting was inadequate or improper, before the April 21, 2006 discovery deadline for such disclosures had passed. Defendants, however, direct the court to Bossard's affidavit and sealed deposition testimony that there were significant flaws in the underwriting program as sufficient evidence of breach. (Response, Ex. 3 (Bossard Aff.) ¶ 17-19; Dkt. No. 168 (Bossard Dep.) (filed under seal)).

Other than citing the lapsed deadline for expert disclosures, the Liquidator makes no argument as to why expert testimony is necessary to determine the question of whether Legion breached any underwriting duty to American Patriot. The court is not convinced at this point in the proceedings that lay testimony from a former underwriter and Legion Vice President on the subject of the Mutual Entities' "discovery" that Cunningham-Lindsey had been under-reserving

claims from the inception of the Program, (Dkt. No. 168 (Bossard Dep.) (filed under seal)), would be insufficient to establish a breach of Legion's underwriting duty. Because the Liquidator failed to adequately support this argument in his Motion for Summary Judgment, the court declines to find at this time that Defendants are unable to prove breach of Legion's underwriting duties without relying upon expert testimony.

Lastly, the Liquidator argues that American Patriot did not suffer any losses from improper claims handling or underwriting. The Liquidator argues that the pricing of the policies on which American Patriot's commissions were calculated was not affected by Legion's ability to properly handle claims or underwrite the Program. The court accepts this argument, as Defendants have pointed to no evidence that American Patriot experienced diminished commissions due to mishandled claims or improper underwriting. Rather, the portions of the deposition testimony to which the parties have directed the court show only that any under-reserving on the part of Legion and/or Cunningham-Lindsey would have affected the price of reinsurance under the Program. (SMF, Ex. H (Saran Dep.) at 124-25; Dkt. No. 168 (Bossard Dep.) (filed under seal)). This evidence does not support the contention that American Patriot's commissions would have been affected in any way.

On the other hand, the Liquidator does recognize that a breach of claims-handling duties would have affected profit or loss under the Shareholder Agreement. (Dkt. No. 201-2 at 14-15). Although the Liquidator argues that this would only have affected the Hendricks, the court has determined that it remains an open question of fact whether Defendants have suffered harm pursuant to the Shareholder Agreement, as discussed above. Because the court finds sufficient evidence of duty, breach, and harm so as to withstand summary judgment, the Liquidator's

motion for summary judgment on the breach of contract affirmative defense is denied.

3.   Setoff

Lastly, in their Fourth Affirmative Defense, Defendants seek the remedy of setoff (or "offset"). As a preliminary matter, the court addresses the scope of Defendants' setoff defense. Defendants' Fourth Affirmative Defense states, in its entirety, "To the extent that any premiums are due and owing to Plaintiff, any such amounts must be off-set by the amount of credits due and owing to American Patriot." (Dkt. No. 10 at 13; Dkt. No. 54 at 12). It is not clear to the court what "credits" are claimed by the Defendants. The Liquidator has taken the position that "credits" refers to money owed as damages on the other affirmative defenses. (Dkt. No. 161-2 at 12, 19). Defendants appear to agree with this characterization of their argument. (Dkt. No. 190 at 3) ("To the extent any money is owed to the Liquidator, Patriot is entitled to a set-off due to Legion's and the related Mutual Entities' intentional and negligent misrepresentations and breaches of contract, or [to] rescission of the Limited Agency Agreement."). Furthermore, because Defendants do not direct the court to any evidence in the record of a different credit due and owing to American Patriot, the court accepts this interpretation of Defendants' Fourth Affirmative Defense.

The insurance insolvency statutes of both Illinois and Pennsylvania permit setoffs in cases of "mutual debts or mutual credits between the [insolvent insurer] and another person." *See* 215 Ill. Comp. Stat. 5/206; 40 Pa. Stat. § 221.32. Mutuality requires that the debts be both contemporaneous in time and owed in the same capacity. *Lincoln Towers Ins. Agency, Inc.*, 684 N.E.2d 900, 904-05 (Ill. App. Ct. 1997) (citing *Stamp v. Ins. Co. of North Am.*, 908 F.2d 1375, 1379 (7th Cir. 1990)); *Koken v. Legion Ins. Co.*, 865 A.2d 945, 953-54 (Pa. Commw. 2004)

(citing William J. Branum, *Setoffs, Recoupments, and Voidable Preferences-In the Insolvency Process*, *in* AMERICAN BAR ASSOCIATION, LAW AND PRACTICE OF INSURANCE COMPANY INSOLVENCY REVISITED 907, 933 (F.L. Semaya ed., 1989)).

A.    Mutuality of Capacity

The Liquidator's main argument is that the debts alleged by Defendants lack mutuality of capacity. First, the Liquidator argues that the debts alleged cannot be mutual because they are not due and owing between the same parties or based upon the same contracts. *See, e.g., In re Doctor's Hospital of Hyde Park*, 337 F.3d 951 (7th Cir. 2003) ("mutuality is satisfied when the offsetting obligations are held by the same parties in the same capacity (that is, as obligor and obligee)"); *Koken v. Reliance Ins. Co.*, 846 A.2d 778, 782 (Pa. Commw. 2004) ("Black letter law dictates that to constitute a mutual debt, the debt must be solely between the same parties and the contracts under [which] the debt [arose] must be between the same parties."); *Koken v. Legion Ins. Co.*, 865 A.2d at 954 ("Mutuality in capacity requires that debts exist between the same persons or entities, although the debts may arise from multiple contracts."). The Liquidator's argument has been addressed, in part, by the court's determination that Legion can be held liable to Defendants pursuant to the "package" of Program documents as a whole. *See* Section 2 *supra*. In other words, this court, as discussed earlier, has found that Legion may be liable to Defendants for damages caused by fraud, negligent misrepresentation, or breach of contract under the Program documents. In this manner, the debts asserted would be considered between the same parties.

The larger issue, in the court's eyes, is whether the debts asserted by Defendants "arose" from the Program documents in a manner appropriate for setoff. Defendants do not seek the

24

enforcement of any contractual provisions at all; rather, Defendants assert their affirmative defenses of fraud, negligent misrepresentation, and breach of contract as a means of avoiding the Limited Agency Agreement. Neither party has addressed the question of whether mutuality of capacity requires that the asserted debts be based on affirmative contractual obligations. In this case, while the Liquidator contends that Defendants owe Legion an affirmative contractual duty to remit premiums on insurance policies sold by American Patriot, Defendants' setoff claim is based on alleged violations of Legion's implied duties under general contract law. The court notes its skepticism that such duties should be considered mutual in the capacity in which they are owed.

The Liquidator's second argument is that mutuality of capacity is lacking because the premiums owed by Defendants are held in a fiduciary capacity. Courts interpreting Illinois law are split on whether this distinction should preclude setoff. On the one hand, the Appellate Court of Illinois, First District, has clearly stated that mutuality of debts or credits cannot exist where "the liability of the party claiming the right to set off arises from a fiduciary duty." *Lincoln Towers*, 684 N.E.2d at 905. Because Illinois law requires insurance premiums to be held in a fiduciary capacity for the benefit of the insurer, *see* 215 Ill. Comp. Stat. 5/500-115, the *Lincoln Towers* majority held that "the absence of mutuality prohibits the [insurance agents] from setting off the amount of their contractual right to commissions against the funds held by them, in a fiduciary capacity, in trust for the benefit of [the insolvent insurer]." *Id.* at 905. In dissent, Presiding Justice Greiman noted that this approach fails to account for the distinction between earned and unearned premiums in § 5/206 of the Illinois Insurance Code, which "provides for the setoff of mutual debts [while] further stat[ing] that *unearned* premiums shall not be the subject of

such setoffs." *Id.* (emphasis added); *see* 215 Ill. Comp. Stat. 5/206.

Three years later, in *Reliance Ins. Co. v. Shriver*, the United States Court of Appeals for the Seventh Circuit declined to find a lack of mutuality based solely on the fiduciary role of the insurance agent, noting that if *Lincoln Towers* "mandates that any time an agent collects a premium, it does so in a fiduciary capacity that automatically eliminates 'mutuality,' . . . the relevant clause of § 5/206 that implies an agent's entitlement to set-off would be useless." *Reliance Ins. Co. v. Shriver, Inc.*, 224 F.3d 641, 649 (7th Cir. 2000). The *Reliance* court instead determined that setoff was "properly disallowed" in *Lincoln Towers* due to a lack of mutuality in time. *Id.* This court is not aware of any case law from the Supreme Court of Illinois, or from any Illinois Appellate court, addressing the tension between *Lincoln Towers* and *Reliance* on this issue. Because this court finds that the debts asserted in this case are not contemporaneous in time (see Section B, *infra*), this court will leave this issue to be decided another day.

For the sake of completeness, the court notes that the Liquidator has not set forth any Pennsylvania cases directly on point regarding the fiduciary role of insurance agents. This lack of case law is perhaps explained by the fact that the Pennsylvania Insurance Department Act of 1921 explicitly bars setoff where premiums are due an insolvent insurer. *See* 40 Pa. Stat. § 221.32(b)(4) ("no setoff or counterclaim shall be allowed in favor of any person where . . . the obligation of the person is to pay premiums, whether earned or unearned, to the insurer"). Because the court finds a lack of contemporaneous debts under both Illinois and Pennsylvania law, the court need not decide whether Pennsylvania's ban should apply to the Liquidator's claims in this case for "premiums, earned and unearned commissions, improper credits taken, and other amounts." (Compl. ¶¶ 1, 3, 16-18).

B.     Mutuality in Time

The second requirement of mutuality is that the debts must share a mutuality in time. This means that "preliquidation obligations can be set off against other preliquidation obligations [but] post-liquidation obligations may not be set off against preliquidation obligations." *Koken v. Legion Ins. Co.*, 865 A.2d at 955. Illinois courts have likewise recognized that "[t]he pre-liquidation/post-liquidation distinction . . . is the key element of mutuality." *Reliance*, 224 F.3d at 648. In order to be considered contemporaneous with another preliquidation debt, a fixed or definite obligation must have accrued *before* liquidation. *Stamp*, 908 F.2d at 1380; *Koken v. Legion Ins. Co.*, 865 A.2d at 955-56 (citing *O'Connor v. Ins. Co. of North Am.*, 622 F. Supp. 611 (N.D. Ill. 1985)).

Legion Insurance Company went into liquidation on July 23, 2003 and Villanova Insurance Company went into liquidation on July 28, 2003. At that time, American Patriot's obligation to pay premiums on insurance policies sold pursuant to the Roofers' Advantage Program would have been set by the Program documents that had been signed in 1997-2001. The time that this debt arose is not affected by the fact that "it has not been valued conclusively [or that] there is a bona fide dispute about the obligation to pay." *Stamp*, 908 F.2d at 1380. Unfortunately, neither party has addressed the essential question of when Legion's debts to American Patriot should be considered to have accrued (if at all). Recognizing that the asserted debts must share a mutuality in time, Defendants only make the conclusory statement, "[t]o be sure, the debts Patriot seeks to set-off arose at the same time under the interrelated Program documents." (Dkt. No. 215 at 13). However, Defendants do not explain why Legion's liability for fraud, negligent misrepresentation, or breach of contract should be considered due and owing

under contractual obligations that existed *prior* to Legion's liquidation. Regrettably, the Liquidator fails to address the essential question of capacity in time at all.

It is not clear to the court that damages for fraud, negligent misrepresentation, or breach of contract should be considered fixed, due, or owing as of the time the events giving rise to these causes of action occurred. At least one Illinois Appellate Court has found that liability which has not matured or is speculative in nature cannot support a right of setoff. *See Clark v. Cannon Steel Erection Co.*, 835 N.E.2d 394, 402 (Ill. App. Ct. 2005) (where funds allegedly due to the defendant by the insolvent insurance company were based on pending lawsuits, setoff not permitted).[15]

The present case is distinguishable from the line of cases holding that certain obligations may be considered preliquidation debts, even if the debt is not due to be paid until after liquidation has commenced. In *O'Connor*, for example, the district court determined that setoff was permitted because the amount due the defendants had been "fixed" prior to liquidation, where the defendants' claims were based on a contract in existence at the time of liquidation and had already been filed prior to the insurance company's insolvency. *O'Connor*, 622 F. Supp. at 618-19; *see also Koken v. Legion Ins. Co.*, 865 A.2d at 955-56 (where obligation was fixed by contract prior to insolvency, the debt will be considered preliquidation, even if not due to be paid until after the liquidation date); *see also Stamp*, 908 F.2d at 1380 (setoff only requires mutuality of obligation, rather than mutual identity of time of payment). In its analysis, the *O'Connor* court relied on bankruptcy provisions, noting that "provable debts under the Bankruptcy Act

---

[15] *See also, Koken v. Legion Insurance Co.*, 900 A.2d at 426 (recognizing some "precedent in bankruptcy for using setoff where one claim sounds in tort and the other in contract," but only in cases where the judgment had been reduced to judgment pre-liquidation).

include all liabilities of the bankrupt founded on contract express or implied which existed at the time of the bankruptcy and either were fixed in amount or susceptible of liquidation." *Id.* at 619. Here, by contrast, the rights and obligations Defendants seek to assert were not defined by any of the Program documents. In fact, Defendants' claims have yet to be fixed in amount and are not susceptible to liquidation even now, four years after Legion originally entered into insolvency.

As of July, 2003, Legion's liability to Defendants on their affirmative defenses had not yet been established, nor was there any contractual provision that fixed the amount that would have been due Defendants under these circumstances. The court therefore finds that the debts asserted by Defendants lack a mutuality of time with the debts asserted against them by the Liquidator, and Defendants' claim for setoff must be dismissed on these grounds.

C.      Defendants' Choice of Relief

Finally, the court notes that the relief sought by Defendants does not fit the usual model of setoff. Generally, setoff is "a cause of action brought by the defendant in opposition to a plaintiff's claim [that] seeks affirmative relief against the plaintiff" in the form of judgment in favor of the defendant. *Monitrend*, 672 A.2d at 362. Unlike a counterclaim, however, "a defendant who has pleaded set-off is not entitled to recover the excess of his claim over the plaintiff's demand." *O'Connor*, 622 F. Supp. at 617 (quoting *Schenck v. Coordinated Coverage Corp.*, 50 A.D.2d 50, 53 (N.Y. App. Div. 1975)). Thus, a defendant asserting setoff seeks only the reduction or elimination of the original claim. *O'Connor*, 622 F. Supp. at 617.

In contrast to most cases in which setoff has been asserted by a defendant in response to a cause of action seeking enforcement of a contract, Defendants in this case do not seek any judgment in their favor on a debt allegedly owed them by the Liquidator. (*See* Dkt. No. 214 at 7)

("Patriot does not seek to recover damages in connection with its affirmative defenses."). Rather, Defendants' goal is merely to bar, or limit, the Liquidator's recovery against them, based on the affirmative defenses of fraud, negligent misrepresentation, and breach of contract.

It seems that the relief sought by Defendants might better have been characterized as a claim for recoupment. *See Monitrend*, 672 A.2d at 363-64 (where defendant's claims "directly attack the Agreement . . . under which the Statutory Liquidator seeks relief, they are in the nature of recoupment and are not setoffs or counterclaims" and are thus permissible despite a lack of mutuality in time); *see also Koken v. Legion Ins. Co.*, 900 A.2d at 429 (finding that recoupment, unlike setoff, is not barred or regulated by Article V of the Pennsylvania Insurance Department Act). The distinction between setoff and recoupment makes sense. As explained by the Appellate Court of Illinois, First District, "liquidation statutes are intended to protect individual policyholders and other claimants without permitting certain classes of creditors to place themselves in a superior position." *Lincoln Towers*, 684 N.E.2d at 969-70 (internal citation omitted). Thus, setoff is strictly controlled by "careful limitations set forth [by] statute." *O'Connor*, 622 F. Supp. at 615, n.2. Recoupment, on the other hand, "is not about allowing a creditor to settle its claims in advance of other creditors; recoupment is about preventing insolvent debtors from receiving more than they are entitled to receive." *Koken v. Legion Ins. Co.*, 900 A.2d at 423; *see also Cox v. Doctor's Assoc., Inc.*, 613 N.E.2d 1306, 1315 (Ill. App. Ct. 1993) ("Recoupment is in the nature of a cross-action in which a defendant alleges that it has been injured by a breach by plaintiff of another part of the contract on which the action is founded.").

In *O'Connor*, the Northern District of Illinois discussed in *dicta* whether the relief sought by the defendants was best viewed under the doctrine of recoupment or as a statutory claim for setoff. *O'Connor*, 622 F. Supp. at 615, n.2. In that case, the defendants sought to set off debts owed to them by the insolvent insurer under the same contract that formed the basis of the Liquidator's claims. Like the Illinois Appellate Court in *Lincoln Towers*, the *O'Connor* court noted that it "must consider the concerns of persons who are not necessarily parties to a contract, but who nonetheless *also* have claims against assets of the insolvent's estate." *Id.* (emphasis added). The *O'Connor* court determined that the relief requested by the defendants was best analyzed under the setoff provisions of the Illinois Insurance Code, which provided a "comprehensive scheme" for resolving conflicting claims to the assets of an insolvent insurer. *Id.* Although stating that the doctrine of recoupment was "not applicable in the context of an insolvency," *id.*, the *O'Connor* court did not explicitly consider a situation in which the defendants asserted affirmative defenses to the enforcement of a contract, rather than seek to enforce contractual obligations allegedly due pursuant to the terms of the contract itself.

This distinction between recoupment and setoff does not affect the Liquidator's Motion for Summary Judgment, as neither party has expressly argued the question of recoupment, and the court raises the issue only for purposes of highlighting the general nature of setoff. As made clear by the statutory text, setoff is intended to be applied in cases of mutual debt. As discussed above, that is not the situation here. Summary judgment is therefore granted in favor of the Liquidator on Defendants' Fourth Affirmative Defense.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment, (Dkt. No. 159), is granted in part and denied in part. Summary judgment is granted in favor of the Plaintiff on Defendants' Fourth Affirmative Defense (Offset) and Ninth Affirmative Defense (Rescission). Summary Judgment is denied on Defendants' Second Affirmative Defense (Unclean Hands), Seventh Affirmative Defense (Estoppel - Fraud), Eighth Affirmative Defense (Estoppel - Negligent Misrepresentation), and Tenth Affirmative Defense (Estoppel - 2000 Program Year), as well as Defendants' Third Affirmative Defense (Failure to Comply with Contractual Obligations).

ENTER:

_James F. Holderman_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: September 7, 2007